Sean P. Reis (SBN 184044)
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123
Email: sreis@edelson.com

Steven L. Woodrow (*Pro Hac Vice admission sought*)
Megan Lindsey (*Pro Hac Vice admission sought*)
EDELSON MCGUIRE, LLC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 357-4878
Facsimile: (312) 589-6378
Email: swoodrow@edelson.com
Email: mlindsey@edelson.com

*Counsel for Plaintiff* DENNIS BURTON

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS BURTON, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NATIONSTAR MORTGAGE LLC, a Delaware limited liability company, <br><br> Defendant. | No: <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> Jury trial demanded |

**NATURE OF THE ACTION**

1.     Plaintiff Dennis Burton ("Burton" or "Plaintiff") brings this suit on behalf of himself and a class of similarly situated homeowners across the nation (the "Class") to challenge Defendant Nationstar Mortgage, LLC's ("Defendant" or "Nationstar") intentional and systematic failure to provide permanent loan modifications to borrowers who signed Permanent Modification Agreements ("PMAs") under the Home Affordable Modification Program ("HAMP").

2.     In doing so, Nationstar has serially failed to honor its express and implied contractual obligations under its PMAs, has made repeated misrepresentations of material fact, and has engaged in business practices that are deceptive, immoral, unscrupulous, unfair, and oppressive under California law. (*See* Burton Trial Period Plan Agreement ("TPP Agreement") and PMA, attached as Group Exhibit A.)

3.     Under the Troubled Asset Relief Program ("TARP"), also known as the taxpayer bailout, the United States Government provided the nation's largest financial institutions with nearly $700 billion in funds to address what was widely accepted as an unprecedented financial crisis. 12 U.S.C. § 5211.

4.     A key feature of TARP is the Making Home Affordable Program, of which the HAMP is a major component. Under the HAMP, servicers like Nationstar and other major lenders receive incentive payments for providing mortgage loan modifications to eligible borrowers such as Plaintiff Burton and the putative Class.

5.     In or around May 2009, Nationstar signed a contract with the U.S. Department of the Treasury, through its agent, Fannie Mae, agreeing to participate in the HAMP as an approved HAMP servicer. Nationstar thereafter executed an amended Servicer Participation Agreement ("SPA") in or around September 2010. (*See* Amended SPA, attached as Exhibit B.)

6.     As a HAMP servicer, Nationstar entered into written PMAs for modifications with Plaintiff and other eligible Nationstar borrowers. These PMAs, which were form contracts, expressly required Nationstar to permanently modify the borrower's loan pursuant to the terms of the PMA.

7.     Plaintiff and the members of the putative Class complied with their obligations under their TPP Agreements and PMAs by executing and submitting all required documentation, answering all questions truthfully, keeping their representations true and accurate, and making their required trial period payments. Despite Plaintiff's and the other Class Members' full performance, Nationstar has ignored its obligations under their PMAs and the HAMP by refusing to permanently modify their loans.

8.     Nationstar's failure to permanently modify its borrowers' loans is no accident. To the contrary, Nationstar has knowingly established a system designed to wrongfully deprive its eligible HAMP borrowers of an opportunity to modify their mortgages, pay their loans, and save their houses from foreclosure. Nationstar's actions, which serve only its interest in extracting as much money as possible from borrowers it deems are at risk of default, thwart the very purpose of HAMP, constitute express and implied breaches of its various contracts, and amount to immoral, unlawful, and unfair business practices under California's Consumer Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL").

**JURISDICTION**

9.     Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This claim is brought as a putative class action consisting of over 100 class members in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the property securing the loan forming the subject of the Parties' dispute is located in Kern County, which is in this District. This Court has supplemental subject-matter jurisdiction over any ancillary or pendent state law claims under 28 U.S.C. § 1367.

**PARTIES**

11.     Plaintiff Burton is a natural person and is now a citizen of the State of Colorado. Plaintiff Burton previously resided on Paulina Street in Bakersfield, California, and his home

1    mortgage is one of the loans at issue in this lawsuit. At all times relevant, Burton was qualified and

2    eligible to participate in the HAMP program under all applicable directives and guidelines.

3         12.    Nationstar Mortgage LLC is a Delaware limited liability company with its principal

4    place of business at 350 Highland Drive, Lewisville, Texas 75067.

5                                    **FACTUAL BACKGROUND**

6    *Congressional Response to National Foreclosure Crisis*

7         13.    The United States has faced a foreclosure crisis over the past several years. To stem

8    the tide early on, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act

9    of 2008 and, on February 17, 2009, Congress amended the statute by passing the American

10   Recovery and Reinvestment Act of 2009 (collectively the "Act"), 12 U.S.C. § 5201 *et. seq.* (2009).

11   The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity

12   and stability to the financial system and ensure that such authority is used in a manner that

13   "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

14        14.    The Act granted the Secretary of the Treasury the authority to establish TARP. 12

15   U.S.C. § 5211. Under TARP, the Secretary was empowered to purchase or make commitments to

16   purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer

17   TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help

18   families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3). The Act further

19   mandates, with regard to any assets acquired by the Secretary that are backed by residential real

20   estate, that the Secretary "shall implement a plan that seeks to maximize assistance for

21   homeowners" and that uses the Secretary's authority over servicers to encourage them to take

22   advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to

23   the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan

24   modifications to prevent avoidable foreclosures" and imposes parallel mandates to implement

25   plans to maximize assistance to homeowners and minimize foreclosures. 12 U.S.C § 5220.

26        15.    On February 18, 2009, acting pursuant to their authority under the Act, the Treasury

27   Secretary and the Director of the Federal Housing Finance Agency announced the HAMP. Under

28   the HAMP, the federal government incentivizes participating servicers to enter into agreements

with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

### Servicer Participation in the HAMP

16.     The industry entities that perform the actual interface with borrowers—including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure—are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Nationstar is a servicer

17.     To participate in HAMP, a servicer must execute an SPA with the federal government. In or around May 2009, representative of Nationstar executed an SPA, thereby making Nationstar a participating servicer in the HAMP. In September 2010, Nationstar executed an amended SPA. (*See* Ex. B.)

18.     The SPA and amended SPA executed by Nationstar incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers. The SPA and amended SPA mandate that a Participating Servicer "shall perform" the activities described in the HAMP Documentation "for all mortgage loans it services."

19.     The HAMP Documentation requires Participating Servicers to evaluate *all loans* that are delinquent 60 days or greater for HAMP modifications. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the HAMP is appropriate for the borrower.

### TPP Agreements

20.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a TPP Agreement. Nationstar's form TPP Agreements require borrowers to make certain representations, provide relevant information, and make trial period

payments at a revised rate designed to keep the borrower in his or her home. (*See, e.g.,* Burton

TPP Agreement, Grp. Ex. A.)

21.     Nationstar's TPP Agreements provide that Nationstar will extend offers for

permanent modification to those homeowners who execute the TPP Agreement and fulfill the

documentation and payment requirements. (*Id.*) If a homeowner executes the TPP Agreement[1],

complies with all documentation and representation requirements, and makes all of the trial period

payments on time, the second stage of the HAMP process is triggered in which Nationstar is

required to offer the home owner a PMA.

***Upon Completion of the Trial, the Borrower executes a PMA***

22.     Once the trial is complete, the servicer is to provide a PMA for the borrower's

signature. Once signed, the Participating Servicer signs and causes the loan to be permanently

modified. This case challenges Nationstar's serial failure to honor its PMAs. Rather than modify

the loans of borrowers with signed PMAs, Nationstar has deprived homeowners of their

contractual rights and improperly foreclosed on borrowers who otherwise should have been able to

save their homes. Nationstar's conduct is especially egregious because Nationstar refuses to

correct known errors, misrepresents to borrowers that they must be in default to participate in the

HAMP, improperly reviews borrowers after their Modification Effective Dates, fails to provide

approvals and denials within reasonable periods of time, fails to adequately hire and train staff to

effectuate loan modifications, routinely loses borrower HAMP applications and related paperwork,

and otherwise routinely disregards the HAMP directives and guidelines. This leads to arbitrary and

capricious denials of HAMP applications and refusals to permanently modify loans that—but for

Nationstar's misconduct—would have, could have, and should have been modified.

---

[1]     On October 8, 2009, the HAMP Supplemental Directive 09-07 adopted the new form of the TPP Agreement that no longer required a borrower's signature. *See* S.D. 09-07, available at https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd0907.pdf, last visited February 21, 2013.

## FACTS RELATING TO NAMED PLAINTIFF BURTON

23.    Burton and Nationstar entered into a HAMP TPP Agreement that was signed by Burton on April 30, 2009, and was thereafter signed by a representative of Nationstar. The TPP Agreement specifically states:

> I understand that after I sign and return two copies of the Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

24.    The TPP Agreement bears a "Trial Period Plan Effective Date" of May 6, 2009.

25.    Nationstar sent Burton a signed copy of the TPP Agreement and did not send him notice that he did not qualify.

26.    Burton timely made each of the $1,921.58 monthly trial payments due to Nationstar on May 6, 2009, June 1, 2009, and July 1, 2009.

27.    Thereafter, Nationstar sent Burton a HAMP PMA. Burton executed the PMA promptly on August 25, 2009 and returned it to Nationstar. Nationstar, through one of its representatives, countersigned the PMA on or about October 9, 2009, and sent the signed PMA back to Burton.

28.    Burton then waited for Nationstar to record and otherwise put his PMA into effect as its terms required. Burton telephoned Nationstar repeatedly, and was told that all the paperwork had been received and that Nationstar simply had to "book" the modification. The representative instructed Burton to keep paying the amount set forth in the PMA, or $1,915.20.

29.    Burton continued to pay the $1,915.20 set forth in the PMA. He telephoned and spoke with Nationstar several times each week inquiring about his permanent modification. Each time, Mr. Burton was assured that the permanent modification was simply waiting to be "booked" and that his loan would be modified soon. Burton was continuously told to keep making his reduced payments as set forth in the PMA, which he did. During this time, Burton received a Notice of Trustee's sale indicating the property had been sold. When Burton called Nationstar, they assured him this was not an actual foreclosure and again, that the permanent modification simply needed to be "booked."

30.     After several months, and notwithstanding Burton's compliance with the TPP Agreement and PMA, and despite Nationstar's execution of all documents and acceptance of all payments thereunder from Burton, Nationstar refused to honor the PMA by modifying Burton's loan documents.

31.     Instead of honoring the TPP Agreement and PMA, in a letter dated March 7, 2010, Nationstar indicated that it was terminating the PMA and dropping Burton from the HAMP because, supposedly, his property was not "owner occupied," and that it was proceeding with the foreclosure. At that time, Burton's wife and seven children were residing full time at the Bakersfield property. Burton was temporarily working in Colorado and would return periodically to California and stay at the Bakersfield property when he visited. Burton took such employment when it became evident that Nationstar was defaulting on the PMA and Burton would need additional income to save his home. That the property was supposedly not "owner occupied" was incorrect and was merely used by Nationstar as a pretext for not honoring Burton's PMA, which had been completed five months earlier. Nationstar had no such authority to re-evaluate Burton's eligibility in March 2010, several months after his PMA's Modification Effective Date.

33.     Despite repeated attempts to explain his situation to Nationstar, the Servicer refused to honor Burton's PMA by modifying his loan. Instead, Nationstar caused a foreclosure of its lien on the Bakersfield property and threw Burton, his wife, and their seven children out of their home, forcing them to find alternative living arrangements. Nationstar either still holds title to the Bakersfield property or sold it to a new buyer.

34.     On January 31, 2013, through his attorneys, Burton sent a certified letter, return receipt requested, to Nationstar's California address (as well as its Texas headquarters) asking the company to rectify its failure to honor Burton's TPP Agreement and PMA by permanently modifying his mortgage. The letter further asked that Nationstar demonstrate that Burton's situation is unique in light of numerous public complaints about the company's loan modification and mortgage servicing operations. No response to the letter was received by Burton or his counsel.

# CLASS ALLEGATIONS

36.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full. This class action is brought by Plaintiff on behalf of a nationwide class defined as follows:

> All homeowners nationwide who had executed permanent modification agreements ("PMAs") with Nationstar from January 2008 through the present whose PMA Nationstar refused to honor by permanently modifying the borrowers' loans.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; and (4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the Class Definition may become necessary following discovery.

37.     Plaintiff sues on his own behalf and on behalf of the above-defined Class under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

38.     Plaintiff does not know the exact size or identities of the members of the proposed Class, since such information is in the exclusive control of Defendant. Prior to filing this lawsuit, Plaintiff sent a letter via certified mail to Defendant asking for any information Nationstar showing that its failure to modify Burton's loan (even though he had a signed PMA) was a "one off" as opposed to a larger problem. Plaintiff's letter explained that numerous complaints existed online regarding the company's mortgage servicing activities. Nationstar refused to provide any documents indicating that, unlike with Burton's loan, it properly and appropriately "booked" or otherwise effectuated and/or caused the loans of its other borrowers with signed PMAs to be permanently modified.

39.     Plaintiff believes that the Class encompasses hundreds of individuals whose identities can be readily determined from Defendant's books and records. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

40.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million. All members of the Class have been subject to and affected by the

same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Class and that are subject to common proof, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a. Whether Nationstar's signed PMAs with its customers obligated it to permanently modify those customers' loans;

b. Whether Nationstar breached express and implied terms of its signed PMA with Burton and its other customers by failing to permanently modify their loans;

c. Whether Nationstar falsely represented to Burton and the other Class Members that it would permanently modify their loans;

d. Whether Burton and the Class Members reasonably relied on Nationstar's misrepresentations that it would permanently modify their loans to their detriment;

e. Whether Burton and the Class Members conferred benefits on Nationstar, or whether Nationstar retains benefits under circumstances where it would be inequitable to allow Nationstar to keep retaining such benefits;

f. Whether Nationstar violated the Equal Credit Opportunity Act with respect to Burton and the Class by failing to provide timely modification or denial decisions with respect to their HAMP modifications;

g. Whether Nationstar wrongfully foreclosed on Burton and the other Class Members;

h. Whether Burton and the other Class Members have suffered damages; and

i. Whether Nationstar's conduct with respect to Burton and the other Class Members can be enjoined as to all of them such that injunctive relief and corresponding declaratory relief are appropriate.

41.   Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiff and the other members of the Class were subject to the same conduct, signed substantially the same agreements, and were met with the same refusal to permanently modify their loans.

42.   Plaintiff will fairly and adequately represent the interests of the Class, is committed to the vigorous prosecution of the claims, and has retained attorneys who are qualified to pursue this litigation and have experience in class actions and HAMP litigation specifically.

43.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

44.     The Defendant has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

45.     Common issues predominate and are central to the litigation over any perceived individual issues. A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

### COUNT I
### Breach of Contract
### (On behalf of Plaintiff Individually and the Class)

46.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

47.     Nationstar's signed TPP Agreement is an enforceable contract requiring Nationstar to provide Burton an offer to permanently modify his loan, and the signed PMA is an enforceable contract for a permanent loan modification. Both contracts contain an offer by Nationstar in exchange for monthly trial payments or permanent modification payments. Burton accepted both agreements by signing and returning the agreements to Nationstar. He fulfilled his obligations under the contracts by keeping his representations true, making his trial payments, and providing several other forms of consideration, including additional exchanged promises and the foregoing of other opportunities.

***Breach of promise to permanently modify loans***

48.     Nationstar's signed PMA with Burton specifically stated that, "If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the mortgage." (*See* Preamble to PMA, Ex. A.)

49.     Nationstar's signed PMA with Burton further stated that, "If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set

forth in Section 2 have been met, the Loan Documents will automatically become modified on August 1, 2009 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on September 1, 2009." (*See* PMA ¶ 3, Ex. A).

50.     Nationstar materially breached both of these provisions by failing to permanently modify Burton's and the other Class Members' loans and by instead foreclosing on them or wrongfully dispossessing them of their homes, or churning and steering the customers into less favorable foreclosure alternatives.

51.     As a result of these breaches, Burton and the members of the Class have suffered damages to be proven at trial, including but not limited to being:

      a.      Denied the value of the offer for permanent modification they should've received in the form of lower monthly payments (in Burton's case, an approximate $300 - $500 monthly savings for the remaining 27 years on the loan),

      b.      Denied access to the HAMP's Principal Reduction Alternative Program,

      c.      Denied the opportunity to collect Pay-for-Performance Success payments from the government,

      d.      Denied the opportunity to obtain a modification of their second lien mortgage through the 2MP (the HAMP program that allows for modification of second liens),

      e.      Denied the opportunity to collect Pay-for-Performance Success payments from the government under the 2MP,

      f.      Denied the opportunity to have their unpaid late fees waived (*see* PMA, Section 3),

      g.      Charged late fees before and during the trial period, and after the Modification Effective Date, and having their monthly payments improperly used to service those fees,

      h.      Charged appraisal fees, fees for "broker price opinions", and other valuation and administrative fees during the modification process, and having their monthly trial payments improperly used to service those fees,

      i.      Reported improperly as having a series of delinquent payments to the credit bureaus once their modifications were improperly denied or after they refused to make additional trial payments (beyond the three or four required payments) and other damage to credit scores and ratings, including increasing the total cost of credit,

j.      Deprived of the opportunity to refinance their homes, or seek other means to mitigate losses,

k.      Subject to the incorrect application of their trial payments to fees and charges instead of appropriately to principal and interest on their loans, leading to excess interest charges,

l.      Forced to send and re-send the bank documents including large packets of information, either via fax or mail, at the borrowers' expense, in response to Nationstar's routine claims of lost or outdated information,

m.      Subject to emotional distress caused by Nationstar dragging out the HAMP process, sending default letters, claiming to have never received documents, providing false justifications for denying permanent modifications, and instituting foreclosure proceedings even though the borrowers had satisfied their PMAs and were owed permanent modifications, and

n.      Foreclosed on and disposed of their homes even though their loans should've been permanently modified.

52.      To the extent damages present an inadequate remedy at law, Burton and the Class Members are entitled to specific performance under their PMAs requiring Nationstar to restore them to possession along with their promised permanent loan modifications, with Nationstar incurring all costs, fees, and other charges to carry out such performance.

***Breach of promise to provide a timely approval or denial***

53.      Nationstar's signed PMAs obligated Nationstar to verify its customers' continued eligibility prior to the Modification Effective Dates set forth in their PMAs. (*See* PMA ¶¶ 2A-B.)

54.      Burton's PMA with Nationstar specified August 1, 2009 as the Modification Effective Date.

55.      Nationstar breached the requirement that it verify that its customers' representations continued to be true prior to the Modification Effective Date by delaying its review and continuing to evaluate borrowers long after their Modification Effective Dates had passed. In Burton's case, for example, Nationstar was continuing to review his eligibility for the HAMP through March 7, 2010, despite his Modification Effective Date having passed seven months earlier.

56.      As a result of these breaches, Burton and the Class Members suffered damages in the form of those set forth in Paragraph 51 above.

**COUNT II**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On behalf of Plaintiff Individually and the Class)**

57.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

58.     Every contract contains an implied covenant requiring that neither party act to disrupt the other's ability to enjoy the benefit of the bargain. Furthermore, where a contract provides one of the Parties with discretion or sole authority to carry out obligations under the agreement for the benefit of the other Party, the Party enjoying such discretion and authority may not abuse it or exercise it in such a manner so as to deprive the other Party of the benefits of the contract.

59.     Nationstar has intentionally and continuously acted in a manner so as to frustrate its borrowers' ability to obtain modifications of their mortgages. Nationstar has abused its discretion under its PMAs, which require that it permanently modify its borrowers' mortgages. Only Nationstar has the ability to effectuate the modifications that it has promised to provide.

60.     By failing to "book," record, or otherwise cause Burton's and its other customers' modifications to be put into effect, Nationstar has abused its authority under its PMAs, frustrated its borrowers' ability to obtain the benefits of their signed PMAs, and accordingly breached the implied covenant of good faith and fair dealing.

61.     As a result of Nationstar's breach, Burton and the Class Members have suffered damages as set forth in Paragraph 51 above.

**COUNT III**
**Promissory Estoppel**
**(On behalf of Plaintiff Individually and the Class, pled in the alternative to Count I)**

62.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

63.     In its written PMAs, Nationstar expressly promised Burton and the other Class Members that if their representations continued to be true and correct, as determined by Nationstar prior to the Modification Effective Date, then their PMAs would "amend and supplement (1) the Mortgage on the property, and (2) the Note secured by the Mortgage" and that their loan documents would "automatically become modified on" their respective Modification Effective Dates.

64.     Burton and the Class Members reasonably relied on these promises, made their required payments, and kept their representations true and correct through their Modification Effective Dates. Had Burton and the Class Members known that Nationstar would subsequently improperly refuse to permanently modify their loans, they would've engaged in other efforts to save their homes, performed "efficient breaches", declared bankruptcy, or taken other alternatives that didn't involve them paying additional monies to Nationstar for essentially nothing in return.

65.     Notwithstanding Burton's and the Class Members' reliance, Nationstar failed to honor its promise to permanently modify Burton's and the Class Members' loans. Instead, Nationstar wrongfully foreclosed on them or churned them into less favorable and more costly foreclosure alternatives.

66.     As a result of Nationstar's conduct, Burton and the Class Members suffered damages as set forth in Paragraph 51 above.

**COUNT IV**
**Fraudulent Misrepresentation**
**(On behalf of Plaintiff Individually and the Class)**

67.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

*Fraudulent Misrepresentations*

68.     In its written PMAs provided to Burton and the Class, and executed by Burton on August 25, 2009, Nationstar expressly, intentionally, and knowingly misrepresented that if Burton's and the Class Members' representations continued to be true and correct, as determined by Nationstar prior to the Modification Effective Date, then their PMAs would "amend and supplement (1) the Mortgage on the property, and (2) the Note secured by the Mortgage" and that their loan documents would "automatically become modified on" the Modification Effective Date.

69.     Burton and the Class Members justifiably relied on these material misrepresentations, made their required payments, and kept their representations true and correct through their Modification Effective Dates. Had Burton and the Class Members known that Nationstar would improperly refuse to permanently modify their loans, they would've engaged in other efforts to save their homes, performed "efficient breaches", declared bankruptcy, or taken other alternatives that didn't involve them paying additional monies to Nationstar for essentially

nothing in return.

70.     Notwithstanding Burton's and the Class Members' reliance, Nationstar failed to honor its promise to permanently modify Burton's and the Class Members' loans. Instead, Nationstar wrongfully foreclosed on them or churned them into less favorable and more costly foreclosure alternatives.

71.     As a result of Nationstar's conduct, Burton and the Class Members suffered damages as set forth in Paragraph 51 above.

***Scheme to Defraud***

72.     Nationstar's conduct and refusal to permanently modify its borrowers' mortgages—despite its borrowers' full compliance with their PMAs—is part of a broader scheme to extract as much money as possible from distressed homeowners prior to unlawfully foreclosing and re-taking possession of their homes. As part of this scheme, Nationstar strings borrowers along for several extra months and inevitably drops them from the HAMP without sufficient justification. Nationstar further improperly violates HAMP directives as set forth in Paragraph 22, above.

73.     Nationstar has intentionally failed to adhere to basic standards of competence and diligence in the hope that its borrowers will become too frustrated to challenge its arbitrary reevaluations and denials.

74.     Nationstar has employed personnel to process loan modifications without sufficient experience or training as part of its effort to confuse and frustrate borrowers.

75.     On information and belief, Nationstar has falsely reported its compliance with the HAMP to the government and has received monies from the government for ostensibly complying with its directives and guidelines when, in reality, it does not.

76.     As a result of this fraudulent pattern and practice, Plaintiff Burton and the Class Members have suffered damages as set forth in Paragraph 51 above.

**COUNT V**
**Unjust Enrichment/Restitution**
**(On behalf of Plaintiff Individually and the Class, pled in the alternative to Count I)**

77.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

78.     Plaintiff and the other Class Members have conferred benefits on Nationstar,

1  including monthly payments that shouldn't have been made and in the form of their homes which

2  shouldn't have been foreclosed on and repossessed.

3       79.    Under such circumstances, equity and good conscience demand that Nationstar

4  make restitution by returning monies paid during and after trial periods where no permanent

5  modification was provided and by restoring borrowers with possession of their wrongfully taken

6  homes.

**COUNT VI**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**Cal. Civ. §§ 1750 *et seq.***
**(On behalf of Plaintiff Individually and the Class)**

9  80.    Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

10

11  81.    Nationstar's practices constitute unfair business practices under the CLRA.

12  82.    On January 28, 2013, Plaintiff Burton, through his counsel, sent via certified mail

   to Nationstar's principal place of business in California (as well as to its headquarters in Texas),

13

14  return receipt requested, a demand under the CLRA that Nationstar rectify within 30 days its

   continuing failure to follow HAMP and provide Burton and the other Class Members with the

15

16  permanent modifications they were promised. The certified mail receipt was marked received by

   Nationstar's California agent on February 1, 2013.

17

18  83.    More than 30 days have passed and Nationstar has failed to respond to the demand

   made within the Notice.

19

20  84.    As a result of Nationstar's practices described herein, Plaintiff and the Class have

   suffered actual damages as set forth in Paragraph 51 above.

21

**COUNT VII**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(On behalf of Plaintiff Individually and the Class)**

24  85.    Plaintiff re-alleges and incorporates the above and below allegations as if set forth

25  fully herein.

26  86.    Nationstar's conduct as described throughout this Complaint is unlawful under the

27  UCL—it violates the Equal Credit Opportunity Act's ("ECOA") requirement that lenders provide

28  timely answers on credit applications, as well as numerous provisions of the HAMP directives that

1   prohibit the charging of late fees, dual tracking, falsely telling borrowers they need to be in default

2   to qualify, reevaluating borrowers after their Modification Effective Dates and otherwise grossly

3   mishandling its borrowers' HAMP applications and contract documents.

4          87.     Nationstar's conduct as described throughout this Complaint, specifically as set

5   forth in Paragraphs 67 – 76 above and incorporated herein, violates the UCL's fraudulent prong.

6          88.     Nationstar's conduct is unfair under the UCL. There is no benefit to society in

7   allowing Nationstar to serially breach its PMAs, mislead borrowers regarding their ability to

8   obtain loan modifications, or foreclose on borrowers who have fully complied with all PMA and

9   HAMP requirements. Taxpayers have funded a system designed to help borrowers save their

10  homes and Nationstar's conduct is the antithesis of how a Servicer should act under the HAMP.

11  Nationstar's conduct as described throughout this Complaint is substantially injurious to

12  consumers and shouldn't be allowed to continue.

13         89.     As a result of Nationstar's unlawful, fraudulent, and unfair conduct, Plaintiff and

14  the members of the Class have suffered loss of money and property.

**COUNT VIII**
**Violation of the Equal Credit Opportunity Act ("ECOA")**
**15 U.S.C. § 1691e**
**(On behalf of Plaintiff Individually and the Class)**

15

16

17         90.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

18         91.     HAMP Servicers like Nationstar are required to follow all other laws, including

19  specifically the ECOA.

20         92.     Regulation B, codified at 12 C.F.R. § 202.9 governs ECOA notices and provides as

21  follows:

22

23         (a) *Notification of action taken, ECOA notice, and statement of specific reasons--*
           *(1) When notification is required.* A creditor shall notify an applicant of action
           taken within:

24         (i) 30 days after receiving a completed application concerning the creditor's
           approval of, counteroffer to, or adverse action on the application;

25         (ii) 30 days after taking adverse action on an incomplete application, unless
           notice is provided in accordance with paragraph (c) of this section;

26         (iii) 30 days after taking adverse action on an existing account; or

27         (iv) 90 days after notifying the applicant of a counteroffer if the applicant does
           not expressly accept or use the credit offered.

28

93.     ECOA, 15 U.S.C. § 1691(d) states that a creditor must provide reasons for a denial of credit.

> (d) Reason for adverse action; procedure applicable; "adverse action" defined
> (1) Within thirty days (or such longer reasonable time as specified in regulations of the Bureau for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.
> (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—
> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken
>
> (6) For purposes of this subsection, the term "adverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit.

94.     Nationstar is a "creditor" as defined by the ECOA, 15 U.S.C. § 1691a(e) because it regularly extends, renews, or continues credit and/or regularly arranges for the extension, renewal, or continuation of credit and in some cases is an assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

95.     Plaintiff and Class Members who made three trial payments and had a signed PMA are "applicants" for a permanent HAMP loan modification as defined by ECOA 15 U.S.C. § 1691a(b).

96.     Plaintiff and Class Members submitted "completed applications" for permanent HAMP loan modifications pursuant to 12 C.F.R. § 202.9(a)(1)(i) no earlier than the date which they made the third payment required by their TPPs.

97.     Nationstar failed to provide notice of action taken on Plaintiff's and Class Members' applications or provide specific reasons for denial within 30 days of its receipt of a completed application in violation of 15 U.S.C. § 1691(d) and 12 C.F.R. § 202.9(a).

98.     In the alternative, Nationstar failed to act on Plaintiff's and Class Members' incomplete applications or provide specific reasons for denial within 30 days of taking action on incomplete applications in violation of 15 U.S.C. § 1691(d) and 12 C.F.R. § 202.9(a).

99.     Plaintiff and Class Members were charged fees, reported as 30 days or more delinquent on their credit reports, and deprived of the opportunity to take other action to save their homes, including performing an "efficient breach," as a result of Nationstar's failure to take action on their completed credit applications for loan modifications.

### PRAYER FOR RELIEF

**WHEREFORE,** in light of the foregoing, Plaintiff Burton, on behalf of himself and a Class of all others similarly situated, respectfully prays that the Court enter an Order:

a.     Certifying this action as a Class Action, appointing Burton as Class Representative and his Counsel as Class Counsel;

b.     Entering judgment against Nationstar and in favor of Burton and the Class Members for actual and compensatory damages as described herein on Counts I, II, III, IV, V, VI and VIII in an amount to be proven at trial;

c.     Where damages present an inadequate remedy at law on any Count, entering judgment against Nationstar and in favor of Burton and the Class Members for specific performance requiring that Nationstar unwind their foreclosures, permanently modify their loans as promised, and restore them to possession of their wrongfully foreclosed homes covering all attendant fees and costs;

d.     Entering judgment against Nationstar and in favor of Burton and the Class Members for statutory damages and all other available remedies under the CLRA and ECOA;

e.     Awarding punitive damages on Counts IV and VIII against Nationstar;

f.     Awarding restitution on Count V;

g.     Awarding damages for emotional pain, suffering and other actual, non-economic damages caused by Nationstar's wrongful and fraudulent foreclosures;

h.     Enjoining Nationstar's continuous breaches of its PMAs and violations of HAMP directives on all common law claims where available and under the UCL;

i.     Awarding Plaintiff reasonable attorneys' fees and costs; and

j.     Awarding such additional relief as the Court deems necessary and just.

Dated: March 4, 2013

Respectfully Submitted,

DENNIS BURTON, individually and on behalf of a Class of similarly situated individuals,

By:   /s/ Sean P. Reis
          Sean P. Reis

Sean P. Reis (SBN 184044)
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (714) 352-5200
Facsimile: (714) 352-5201
Email: sreis@edelson.com

Steven L. Woodrow (*Pro Hac Vice admission sought*)
Megan Lindsey (*Pro Hac Vice admission sought*)
EDELSON MCGUIRE LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378
Email: swoodrow@edelson.com
Email: mlindsey@edelson.com