Sean P. Reis (SBN 184044)
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123
Email: sreis@edelson.com

Steven L. Woodrow (*admitted Pro Hac Vice*)
Megan Lindsey (*admitted Pro Hac Vice*)
EDELSON PC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 357-4878
Facsimile: (312) 589-6378
Email: swoodrow@edelson.com
Email: mlindsey@edelson.com

*Counsel for Plaintiff* DENNIS BURTON

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS BURTON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONSTAR MORTGAGE LLC, a Delaware limited liability company,<br><br>Defendant. | No: 1:13-cv-00307-LJO-GSA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>Jury trial demanded |

## NATURE OF THE ACTION

1. Plaintiff Dennis Burton ("Burton" or "Plaintiff") brings this suit on behalf of himself and a class of similarly situated homeowners across the nation (the "Class") to challenge Defendant Nationstar Mortgage, LLC's ("Defendant" or "Nationstar") intentional and systematic failure to timely provide permanent loan modifications to borrowers who signed Permanent Modification Agreements ("PMAs") under the Home Affordable Modification Program ("HAMP").

2. In doing so, Nationstar has serially failed to honor its express and implied contractual obligations under its PMAs by providing its borrowers with timely permanent modifications, made repeated misrepresentations of material fact, and engaged in fraudulent and deceptive business practices. (*See* Burton Trial Period Plan Agreement ("TPP Agreement") and PMA, attached as Group Exhibit A.)

3. Under the Troubled Asset Relief Program ("TARP"), also known as the taxpayer bailout, the United States Government provided the nation's largest financial institutions with nearly $700 billion in funds to address what was widely accepted as an unprecedented financial crisis. 12 U.S.C. § 5211.

4. A key feature of TARP is the Making Home Affordable Program, of which HAMP is a major component. Under HAMP, servicers like Nationstar and other major lenders receive incentive payments for providing mortgage loan modifications to eligible borrowers such as Plaintiff Burton and the putative Class.

5. In or around May 2009, Nationstar signed a contract with the U.S. Department of the Treasury, through its agent, Fannie Mae, agreeing to participate in the HAMP as an approved HAMP servicer. Nationstar thereafter executed an amended Servicer Participation Agreement ("SPA") in or around September 2010. (*See* Amended SPA, attached as Exhibit B.)

6. As a HAMP servicer, Nationstar entered into written PMAs for modifications with Plaintiff and other eligible Nationstar borrowers. These PMAs, which were form contracts, expressly required Nationstar to timely permanently modify the borrower's loan pursuant to the terms of the PMA.

7. Plaintiff and the members of the putative Class complied with their obligations under their TPP Agreements and PMAs by executing and submitting all required documentation, answering all questions truthfully, keeping their representations true and accurate, and making their required trial period payments. Despite Plaintiff's and the other Class Members' full performance, Nationstar has ignored its obligations under their PMAs and the HAMP by refusing to timely permanently modify their loans.

8. Nationstar's failure to timely permanently modify its borrowers' loans is no accident. To the contrary, Nationstar has knowingly established a system designed to wrongfully and serially delay the processing of their HAMP permanent modifications. Nationstar's actions, which serve only its interest in extracting as much money as possible from borrowers it deems are at risk of default, thwart the very purpose of HAMP, are fraudulent, and constitute express and implied breaches of its contracts.

## JURISDICTION

9. Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This claim is brought as a putative class action consisting of over 100 class members in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the property securing the loan forming the subject of the Parties' dispute is located in Kern County, which is in this District. This Court has supplemental subject-matter jurisdiction over any ancillary or pendent state law claims under 28 U.S.C. § 1367.

## PARTIES

11. Plaintiff Burton is a natural person and is now a citizen of the State of Colorado. Plaintiff Burton previously resided on Nomi Street in Bakersfield, California, and his home mortgage is one of the loans at issue in this lawsuit. At all times relevant, Burton was qualified and eligible to participate in the HAMP program under all applicable directives and guidelines.

12. Nationstar Mortgage LLC is a Delaware limited liability company with its principal place of business at 350 Highland Drive, Lewisville, Texas 75067.

## FACTUAL BACKGROUND

*Congressional Response to National Foreclosure Crisis*

13. The United States has faced a foreclosure crisis over the past several years. To stem the tide early on, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and, on February 17, 2009, Congress amended the statute by passing the American Recovery and Reinvestment Act of 2009 (collectively the "Act"), 12 U.S.C. § 5201 *et. seq.* (2009). The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

14. The Act granted the Secretary of the Treasury the authority to establish TARP. 12 U.S.C. § 5211. Under TARP, the Secretary was empowered to purchase or make commitments to purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3). The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures" and imposes parallel mandates to implement plans to maximize assistance to homeowners and minimize foreclosures. 12 U.S.C § 5220.

15. On February 18, 2009, acting pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced HAMP. Under the HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP

modification.

*Servicer Participation in the HAMP*

16. The industry entities that perform the actual interface with borrowers—including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure—are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Nationstar is a servicer.

17. To participate in the HAMP, a servicer must execute an SPA with the federal government. In or around May 2009, a representative of Nationstar executed an SPA, thereby making Nationstar a participating HAMP servicer. In September 2010, Nationstar executed an amended SPA. (*See* Ex. B.)

18. The SPA and amended SPA executed by Nationstar incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers. The SPA and amended SPA mandate that a Participating Servicer "shall perform" the activities described in the HAMP Documentation "for all mortgage loans it services."

19. The HAMP Documentation requires Participating Servicers to evaluate *all loans* that are delinquent 60 days or greater for HAMP modifications. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the HAMP is appropriate for the borrower.

*TPP Agreements*

20. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a TPP Agreement. Nationstar's form TPP Agreements require borrowers to make certain representations, provide relevant information, and make trial period payments at a revised rate designed to keep the borrower in his or her home. (*See, e.g.,* Burton TPP Agreement, Grp. Ex. A.)

21. Nationstar's TPP Agreements provide that Nationstar will extend offers for permanent modification to those homeowners who execute the TPP Agreement and fulfill the documentation and payment requirements. (*Id.*) If a homeowner executes the TPP Agreement[1], complies with all documentation and representation requirements, and makes all of the trial period payments on time, the second stage of the HAMP process is triggered in which Nationstar is required to offer the homeowner a PMA.

*Upon Completion of the Trial, the Borrower executes a PMA*

22. Once the trial is complete, the servicer is to provide a PMA for the borrower's signature. Once signed, the Participating Servicer signs and causes the loan to be permanently modified. This case challenges Nationstar's serial failure to timely honor its PMAs. Rather than modify the loans of borrowers with signed PMAs by the later of the date when Nationstar countersigned the PMA or the Modification Effective Date set forth in the PMA, Nationstar has deprived homeowners of their contractual right to receive a timely permanent modification consistent with the terms of the signed PMA.

23. Nationstar's conduct is especially egregious because Nationstar refuses to correct known errors, improperly reviews borrowers after their Modification Effective Dates, fails to provide approvals and denials within reasonable periods of time, fails to adequately hire and train staff to effectuate loan modifications, and otherwise routinely disregards the HAMP directives and guidelines. This leads to arbitrary and capricious refusals to timely permanently modify loans that—but for Nationstar's misconduct—would have, could have, and should have been timely modified.

**FACTS RELATING TO NAMED PLAINTIFF BURTON**

24. Burton and Nationstar entered into a HAMP TPP Agreement that was signed by Burton on April 30, 2009, and was thereafter signed by a representative of Nationstar, stating:

---

[1] On October 8, 2009, the HAMP Supplemental Directive 09-07 adopted the new form of the TPP Agreement that no longer required a borrower's signature. *See* S.D. 09-07, available at https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd0907.pdf, last visited June 12, 2013.

> I understand that after I sign and return two copies of the Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

25.  The TPP Agreement bears a "Trial Period Plan Effective Date" of May 6, 2009.

26.  Nationstar sent Burton a signed copy of the TPP Agreement and did not send him notice that he did not qualify.

27.  Burton timely made each of the $1,921.58 monthly trial payments due to Nationstar on May 6, 2009, June 1, 2009, and July 1, 2009.

28.  Thereafter, Nationstar sent Burton a HAMP PMA with a Modification Effective Date of August 1, 2009. Burton executed the PMA promptly on August 25, 2009 and returned it to Nationstar. Nationstar, through one of its representatives, countersigned the PMA on or about October 9, 2009 and sent the signed PMA back to Burton.

29.  As of both August 1, 2009 and October 9, 2009, Burton resided in his home located on Nomi Street in Bakersfield, California—which is the property secured by the loan at issue in this lawsuit. In fact, Burton permanently resided in that home in Bakersfield, California, along with his wife and their seven children, during all of August, September, October, November, and December 2009.

30.  During that time, Burton waited for Nationstar to record and otherwise put his PMA into effect as its terms required. Burton telephoned Nationstar repeatedly, and was told that all the paperwork had been received and that Nationstar simply had to "book" the modification. The representative instructed Burton to keep paying the amount set forth in the PMA, or $1,915.20.

31.  Burton continued to pay the $1,915.20 set forth in the PMA. He telephoned and spoke with Nationstar several times, often multiple terms per week, inquiring about his permanent modification. Each time, Mr. Burton was assured that the permanent modification was simply waiting to be "booked" and that his loan would be modified soon. Burton was continuously told to keep making his reduced payments as set forth in the PMA, which he did. During this time, Burton received a Notice of Trustee's sale indicating the property had been sold. When Burton called

Nationstar, they assured him this was not an actual foreclosure and again, that the permanent modification simply needed to be "booked."

32. On December 2, 2009—and despite still having not taken the necessary steps to finalize, implement, "book", effectuate, or take whatever other step necessary to cause Burton's loan to become permanently modified as it should have done as of October 9, 2009—Burton received in the mail from Nationstar a letter informing him that he was in default, that he immediately owed Nationstar over $24,000, and that Nationstar was preparing to proceed to foreclosure. The letter further informed Burton that he should explore a HAMP modification, which the letter described as a government sponsored program that included a trial plan—completely ignoring the fact that Burton had already completed a HAMP trial plan and he was actually waiting for Nationstar to cause his loan to become permanently modified.

33. Following the receipt of this December 2, 2009 letter, and reasonably believing that Nationstar was not going to honor the PMA, Burton learned about a potential job opportunity that would require him to temporarily work in Colorado. Burton pursued and eventually took such employment only because it had become evident that Nationstar was defaulting on the PMA and Burton would need additional income to save his home.

34. On or about December 25, 2009, and while still living at his home on Nomi in Bakersfield, Burton traveled to Colorado to interview for the job and was later offered the position. On or about January 17, 2010, Burton temporarily relocated to Colorado to pursue the employment opportunity and earn additional money in an attempt to save his home. At that time, Burton's wife and seven children were still residing full time at the Bakersfield property. Burton was temporarily working in Colorado and would return periodically to California and stay at the Bakersfield property when he visited.

35. In further default of its obligations under the PMA, in a letter dated March 7, 2010, Nationstar indicated that it was terminating the PMA and dropping Burton from the HAMP because, supposedly, his property was not "owner occupied," and that it was proceeding with the foreclosure. That the property was supposedly not "owner occupied" was incorrect and was merely used by Nationstar as a pretext for not honoring Burton's PMA, which had been completed five

months earlier. Nationstar had no such authority to re-evaluate Burton's eligibility in March 2010, several months after his PMA's Modification Effective Date.

36. Despite repeated attempts to explain his situation to Nationstar, the Servicer refused to honor Burton's PMA by modifying his loan. Instead, Nationstar caused a foreclosure of its lien on the Bakersfield property and threw Burton, his wife, and their seven children out of their home, forcing them to find alternative living arrangements. Nationstar either still holds title to the Bakersfield property or sold it to a new buyer.

37. On January 31, 2013, through his attorneys, Burton sent a certified letter, return receipt requested, to Nationstar's California address (as well as its Texas headquarters) asking the company to rectify its failure to honor Burton's TPP Agreement and PMA by permanently modifying his mortgage. The letter further asked that Nationstar demonstrate that Burton's situation is unique in light of numerous public complaints about the company's loan modification and mortgage servicing operations. No response to the letter was received by Burton or his counsel.

## CLASS ALLEGATIONS

38. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full. This class action is brought by Plaintiff on behalf of a nationwide class defined as follows:

> All homeowners nationwide who received permanent modification agreements (PMAs) signed by Nationstar from January 2009 through the date when Nationstar implemented its "book then sign" procedure for PMAs, whose permanent modifications Nationstar did not book by the Effective Date stated in the PMA or by the day Nationstar executed the PMA, whichever is later.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; and (4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the Class Definition may become necessary following additional discovery.

39. Plaintiff sues on his own behalf and on behalf of the above-defined Class under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

40. Plaintiff does not know the exact size or identities of the members of the proposed Class, since such information is in the exclusive control of Defendant. However, Plaintiff reasonably believes that the Class encompasses hundreds of individuals whose identities can be determined from Defendant's books and records. Nationstar has records regarding the dates it performed its modifications and whether its files experienced "aging", a term that describes files that sit without activity being timely taken on them as required under HAMP. Instead of timely performing tasks as required, Nationstar serially failed to "book" or implement modifications by the later of the Modification Effective Date in the PMA or the date when Nationstar countersigned the PMA. Nationstar serially failed to do this and instead countersigned PMAs and then took no action whatsoever, allowing the file to "age" instead of permanently modifying the loans. Furthermore, Nationstar is required to enter dates electronically on each borrower's file for when specific file activity is completed and internal reports, among other documents, will reveal class member identifies. Such electronic updates include when a modification is ultimately "booked." Therefore, proposed Class membership is ascertainable based upon objective criteria and is so numerous that joinder of all members is impracticable.

41. Based on the size of the modifications at issue, Plaintiff believes the amount in controversy readily exceeds $5 million and likely involves hundreds of millions of dollars worth of home loans. All members of the Class have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements, including Nationstar's serial failure to cause loans to be permanently modified within the time limits established by HAMP, the TPPs, and the PMAs. There are questions of law and fact that are common to the Class and that are subject to common proof, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

    a. Whether Nationstar's signed PMAs with its customers obligated it to permanently modify those customers' loans;

  b.  Whether Nationstar breached express and implied terms of its signed PMA with Burton and its other customers by failing to permanently modify their loans within time limits established under HAMP and HAMP documents;

  c.  Whether Nationstar falsely represented to Burton and the other Class Members that it would timely permanently modify their loans;

  d.  Whether Burton and the Class Members reasonably relied on Nationstar's misrepresentations that it would timely permanently modify their loans to their detriment;

  e.  Whether Nationstar wrongfully foreclosed on Burton and the other Class Members or otherwise forced them into less beneficial foreclosure-prevention alternatives;

  f.  Whether Burton and the other Class Members have suffered damages; and

  g.  Whether Nationstar's conduct with respect to Burton and the other Class Members can be enjoined as to all of them such that injunctive relief and corresponding declaratory relief are appropriate.

42. Plaintiff's claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiff and the other members of the Class were subject to the same conduct, signed substantially the same agreements, and were met with the same refusal to timely permanently modify their loans.

43. Plaintiff will fairly and adequately represent the interests of the Class, is committed to the vigorous prosecution of the claims, and has retained attorneys who are qualified to pursue this litigation and have experience in class actions and HAMP litigation specifically.

44. This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

45. The Defendant has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

46. Common issues predominate and are central to the litigation over any perceived individual issues. To the extent there are differences in the amounts of damages incurred, sampling or mini trials may be used to determine Class members' aggregate damages. A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

**COUNT I**
**Breach of Contract**
**(On behalf of Plaintiff Individually and the Class)**

47. Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

48. Nationstar's signed TPP Agreement is an enforceable contract requiring Nationstar to provide Burton an offer to permanently modify his loan, and the signed PMA is an enforceable contract for a timely permanent loan modification. Both contracts contain an offer by Nationstar in exchange for monthly trial payments or permanent modification payments. Burton accepted both agreements by signing and returning the agreements to Nationstar. He fulfilled his obligations under the contracts by keeping his representations true—including that the property would be owner occupied—making his trial payments, and providing several other forms of consideration, including additional exchanged promises and the foregoing of other opportunities.

49. Nationstar's signed PMA with Burton specifically stated that, "If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the mortgage." (*See* Preamble to PMA, Ex. A.)

50. Nationstar's signed PMA with Burton further stated that, "If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on August 1, 2009 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. The Loan Documents will be modified and the first modified payment will be due on September 1, 2009." (*See* PMA ¶ 3, Ex. A.)

51. Nationstar's signed PMAs allowed Nationstar—"prior to the Modification Effective Date"—to verify whether its customers' representations in Section 1 of the PMA, including that the property is owner occupied, are no longer true and correct. (*See* PMA ¶¶ 2A-B.) The PMA did not contemplate or allow for such evaluations after its borrowers' respective Modification Effective Dates.

52. Nationstar materially breached these provisions by failing to permanently modify

Burton's and the other Class Members' loans by the later of the Modification Effective Date or the date when Nationstar countersigned the PMA. Instead, Nationstar serially delayed implementing or booking the permanent modifications and often re-reviewed borrowers' eligibility for the HAMP PMA after the Modification Effective Date had passed and thereafter forced borrowers into foreclosure or less favorable foreclosure-avoidance alternatives like higher interest internal modifications.

53.     Specific to Burton, his PMA with Nationstar stated August 1, 2009 as the Modification Effective Date and Nationstar countersigned the PMA on October 9, 2009. Nationstar breached by failing to "book" or implement the permanent modification at that time when it countersigned the PMA. Instead, Nationstar re-reviewed Burton's eligibility for a modification well after the Modification Effective Date had passed, and well after Nationstar had countersigned and provided Burton with a copy of his PMA, finding he supposedly didn't qualify for a PMA because his property wasn't owner occupied.

54.     As of August 1, 2009, Burton permanently resided in his home located on Nomi Street in Bakersfield, California. Likewise, Burton permanently resided in his home on Nomi Street on October 9, 2009 when Nationstar signed the PMA. In fact, Burton continued to reside in his California home for all of October, November, and December 2009, and did not temporarily move from his home until on or about January 17, 2010 after it became apparent that Nationstar was not going to honor the PMA. Therefore, Burton satisfied the precondition described in Section 1(B) of the PMA because he "live[d] in the Property as [his] principal residence, and the Property [had] not been condemned" as of both August 1, 2009 and October 9, 2009.

55.     Nationstar breached the PMA by failing to modify his loan on October 9, 2009 when Nationstar countersigned his PMA and by instead re-verifying whether his representations continued to be true long after their Modification Effective Date had passed. Burton's file was supposedly under review through March 7, 2010, despite his Modification Effective Date having passed no fewer than five months earlier on October 9, 2009.

56.     As a result of these breaches, Burton and the members of the Class have suffered damages to be proven at trial, including but not limited to being:

a. Reported as delinquent to the credit bureaus after the modification should have been booked or implemented, thus delaying the opportunity to rebuild credit and increasing the total cost of credit;

b. Denied or temporarily deprived/delayed access to the HAMP's Principal Reduction Alternative Program,

c. Denied or temporarily deprived/delayed the opportunity to collect Pay-for-Performance Success payments from the government,

d. Denied or temporarily deprived/delayed the opportunity to obtain a modification of their second lien mortgage through the 2MP (the HAMP that allows for modification of second liens),

e. Denied or temporarily deprived/delayed the opportunity to collect Pay-for-Performance Success payments from the government under the 2MP,

f. Subject to emotional distress caused by Nationstar dragging out the HAMP process, sending default letters, claiming to have never received documents, and providing false justifications for delaying or refusing to timely book permanent modifications,

g. Denied the value of the permanent modification they should've received in the form of lower monthly payments or lower finance charges compared with the modifications they were actually provided, and/or

h. Foreclosed on and disposed of their homes even though their loans should've been permanently modified.

57. To the extent damages present an inadequate remedy at law, and where possible, Burton and the Class Members are entitled to specific performance under their PMAs requiring Nationstar to restore them to possession along with their promised permanent loan modifications, with Nationstar incurring all costs, fees, and other charges to carry out such performance.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (On behalf of Plaintiff Individually and the Class)

58. Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

59. Every contract contains an implied covenant requiring that neither party act to disrupt the other's ability to enjoy the benefit of the bargain. Furthermore, where a contract provides one of the Parties with discretion or sole authority to carry out obligations under the agreement for the benefit of the other Party, the Party enjoying such discretion and authority may not abuse it or exercise it in such a manner so as to deprive the other Party of the benefits of the contract.

60. Nationstar has intentionally and continuously acted in a manner so as to frustrate its borrowers' ability to obtain timely modifications of their mortgages. Nationstar has therefore abused its discretion under its PMAs, which require that it permanently modify its borrowers' mortgages by the later of the Modification Effective Date or the date when Nationstar countersigns the PMA. Only Nationstar has the ability to timely effectuate the modifications that it has promised to provide.

61. By failing to "book," record, or otherwise cause Burton's and its other customers' modifications to be put into effect by the later of the PMA's Modification Effective Date or the date when Nationstar countersigned the PMA, Nationstar has abused its authority under its PMAs, frustrated its borrowers' ability to obtain the benefits of their signed PMAs, and accordingly breached the implied covenant of good faith and fair dealing.

62. With specific regard to Burton, Nationstar failed to "book," record, or otherwise cause his modification to be put into effect on October 9, 2009 when Nationstar countersigned his PMA. Instead, Nationstar exceeded the scope of its authority under the PMA by re-reviewing Burton's residency long after August 1, 2009 (the Modification Effective Date) and long after October 9, 2009 (the date when Nationstar had countersigned Burton's PMA). Burton resided in his California home on both August 1, 2009 and October 9, 2009, and therefore satisfied the precondition described in Section 1(B) of the PMA, along with all the other preconditions described in Section 1 as of the date when Nationstar countersigned and should have booked Burton PMA.

63. As a result of Nationstar's breach, Burton and the Class Members have suffered damages as set forth in Paragraph 56 above.

### COUNT III
### Promissory Estoppel
### (On behalf of Plaintiff Individually and the Class, pled in the alternative to Count I)

64. Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

65. Nationstar promised its HAMP borrowers that if they complied with and satisfied the terms set forth in the Program Documents they would receive timely permanent modifications of their mortgages.

66.     On or about October 9, 2009, Nationstar countersigned Burton's PMA. In its written PMAs, Nationstar expressly promised Burton and the other Class Members that if their representations continued to be true and correct, as determined by Nationstar prior to the Modification Effective Date, the PMAs would "amend and supplement (1) the Mortgage on the property, and (2) the Note secured by the Mortgage" and that their loan documents would "automatically become modified on" their respective Modification Effective Dates. The PMA further promised that "all unpaid late charges that remain will be waived" and that the principal balance of their mortgages would be modified to "include all amounts and arrearages that will be past due (excluding late charges)." (*See* Grp Ex. A-2.)

67.     In reliance on these promises, Burton and the other Class Members complied with and satisfied the terms of the PMAs, continued making trial payments, and refrained from exploring other options to reduce their monthly payments, bring their loans out of default, save their homes, start rebuilding their credit and/or mitigate their losses. Specifically, after receiving an executed copy of the PMA, Burton continued making trial payments rather than perform an efficient breach by simply handing the property back to Nationstar without further delay. Specific to Burton, by this time (October 2009) he was more than $22,000 in default on his mortgage and could not have brought his loan current.

68.     Had Burton known Nationstar was not actually going to timely fulfill the terms of the PMA (and in fact, was not ever going to book his PMA), he therefore would have stopped making the monthly trial payments in order to mitigate his losses, rather than continue paying on a mortgage that was going to be foreclosed on anyway. "The concept of 'efficient breach' is built into our system of contracts." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (citing *Lockerby v. Sierra,* 535 F.3d 1038, 1042 (9th Cir. 2008).); *Ortiz v. Lyon Mgmt. Grp., Inc.*, 157 Cal. App. 4th 604, 619, 69 Cal. Rptr. 3d 66, 75 (2007) (citing Posner, Economic Analysis of Law (2007) 119–120, 270–273 and Shiffrin, *The Divergence of Contract and Promise* (2007) 120 Harv. L.Rev. 708, 730–733); *see also Wigod v. Wells Fargo Bank, N.A*. 673 F.3d 547 (7th Cir. 2012). Burton was misled into making trial payments instead of performing such a breach.

69.     As a result of Nationstar's conduct, Burton and the Class Members suffered

damages as set forth in Paragraph 56 above.

## COUNT IV
### Fraudulent Misrepresentation
### (On behalf of Plaintiff Individually and the Class)

70. Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

*Fraudulent Misrepresentation*

71. On or about October 9, 2009, Nationstar executed Burton's PMA. In its written PMAs, Nationstar expressly, intentionally, and knowingly misrepresented to Burton and the Class Members that if their representations continued to be true and correct, as determined by Nationstar prior to the Modification Effective Date, their PMAs would "amend and supplement (1) the Mortgage on the property, and (2) the Note secured by the Mortgage" and that their loan documents would "automatically become modified on" the later of their respective Modification Effective Date or the date when Nationstar countersigned the PMA. The PMAs further represented that "all unpaid late charges that remain will be waived" and that the principal balance would be modified to "include all amounts and arrearages that will be past due (excluding late charges)." (*See* Grp Ex. A-2.)

72. Burton and the other Class Members justifiably relied on these material misrepresentations, made their required payments, and kept their representations true and correct through their Modification Effective Dates. In reliance on the misrepresentations contained within the PMA, Burton and the Class continued to make payments rather than perform an efficient breach or explore other options to bring their loans out of default. Specific to Burton, by this time (mid-October 2009) he was more than $22,000 in default on his mortgage and could not have brought his loan current.

73. Had Burton and the Class Members known that Nationstar would improperly refuse to timely permanently modify their loans, they would've engaged in other efforts to save their homes and/or bring their mortgages out of default, such as refinancing their mortgages, performing "efficient breaches" by refraining from making additional payments on a mortgage that was going to be put in foreclosure, declaring bankruptcy, or taking other alternatives that didn't involve them paying additional monies to Nationstar while Nationstar continued to report them as being in

default to the credit bureaus.

74. Notwithstanding Burton's and the Class Members' reliance, Nationstar failed to timely honor its promise to permanently modify Burton's and the Class Members' loans. Instead, Nationstar serially delayed modifying the loan of borrowers with signed PMAs, re-reviewed borrower's eligibility to receive a PMA, and wrongfully foreclosed on borrowers or churned them into less favorable and more costly internal modifications.

75. As a result of Nationstar's conduct, Burton and the Class Members suffered damages as set forth in Paragraph 57 above.

*Scheme to Defraud*

76. Nationstar's conduct and refusal to provide its borrowers with timely loan modifications— despite its borrowers' full compliance with their PMAs—is part of a broader scheme to extract as much money as possible from distressed homeowners (and the government) all-the-while improperly re-reviewing borrowers HAMP eligibility and often foreclosing on them or forcing them into less-beneficial internal modifications. As part of this scheme, Nationstar strings borrowers along for several extra months, continually misrepresenting that the modification is forthcoming or will be finished soon, and often drops them from the HAMP for pretextual reasons, devoid of sufficient justification. Nationstar serially delays instead of acting when required under the HAMP directives and Program Documents, allowing files to age as a matter of routine practice. Further Nationstar sends foreclosure threats to borrowers even if they are in the midst of the HAMP modification process and sends notices to borrowers that ignore that the borrowers are being considered for permanent modifications.

77. Nationstar has intentionally failed to adhere to basic standards of competence and diligence in the hope that its borrowers will become too frustrated to challenge its arbitrary reevaluations and denials.

78. Nationstar has employed personnel to process loan modifications without sufficient experience or training as part of its effort to confuse and frustrate borrowers.

79. On information and belief, Nationstar has falsely reported its compliance with the HAMP to the government and has received monies from the government for ostensibly complying

with its directives and guidelines when, in reality, it does not.

80. As a result of this fraudulent pattern and practice, Plaintiff Burton and the Class Members have suffered damages as set forth in Paragraph 57 above.

**PRAYER FOR RELIEF**

**WHEREFORE,** in light of the foregoing, Plaintiff Burton, on behalf of himself and a Class of all others similarly situated, respectfully prays that the Court enter an Order:

a. Certifying this action as a Class Action, appointing Burton as Class Representative and his Counsel as Class Counsel;

b. Entering judgment against Nationstar and in favor of Burton and the Class Members for actual and compensatory damages as described herein on Counts I, II, III, and IV in an amount to be proven at trial;

c. Where damages present an inadequate remedy at law on any Count, entering judgment against Nationstar and in favor of Burton and the Class Members for specific performance requiring that Nationstar permanently modify their loans as promised in accordance with the signed HAMP PMAs and/or unwind their foreclosures and restore them to possession of their wrongfully foreclosed homes covering all attendant fees and costs;

d. Awarding punitive damages on Count IV against Nationstar;

e. Awarding damages for emotional pain, suffering and other actual, non-economic damages caused by Nationstar's wrongful and fraudulent foreclosures;

f. Enjoining Nationstar's continuous breaches of its PMAs and violations of HAMP directives on all common law claims where available;

g. Awarding Plaintiff reasonable attorneys' fees and costs; and

h. Awarding such additional relief as the Court deems necessary and just.

Dated: December 29, 2013

Respectfully Submitted,

DENNIS BURTON, individually and on behalf of a Class of similarly situated individuals,

By:   /s/ Steven L. Woodrow
      Steven L. Woodrow

Sean P. Reis (SBN 184044)
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (714) 352-5200
Facsimile: (714) 352-5201
Email: sreis@edelson.com

Steven L. Woodrow (*admitted Pro Hac*)
Megan Lindsey (*admitted Pro Hac Vice*)
EDELSON PC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 357-4878
Facsimile: (312) 589-6378
Email: swoodrow@edelson.com
Email: mlindsey@edelson.com

# CERTIFICATE OF SERVICE

I, Steven L. Woodrow, an attorney, hereby certify that I served *Second Amended Class Action Complaint for Damages and Injunctive Relief* by causing true and accurate copies of such papers to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this 29th day of December 2013.

   /s/ Steven L. Woodrow