1  Mark Eisen (SBN - 289009)
   meisen@edelson.com
2  EDELSON PC
   555 West Fifth Street, 31st Floor
3  Los Angeles, California 90013
   Tel: 213.533.4100
4  Fax: 213.947.4251

5  Steven L. Woodrow*
   swoodrow@edelson.com
6  Megan Lindsey*
   mlindsey@edelson.com
7  EDELSON PC
   999 West 18th Street, Suite 3000
8  Denver, Colorado 80202
   Tel: 303.357.4878
9  Fax: 303.446.9111

10 * Admitted *Pro Hac Vice*

11 *Attorneys for Plaintiff* DENNIS BURTON

12                    **UNITED STATES DISTRICT COURT**
13             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

14 DENNIS BURTON, on behalf of himself
15 and all others similarly situated,              No: 1:13-cv-00307-LJO-JLT

16                    Plaintiff,                   **PLAINTIFF'S MOTION FOR CLASS
                                                   CERTIFICATION**
17 v.
                                                   Date: October 6, 2014
18 NATIONSTAR MORTGAGE, LLC, a                     Time: 9:00 a.m.
   Delaware limited liability company,            Crtrm.: Courtroom 4, 7th Floor
19
                    Defendant.
20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR LEAVE**
**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on October 6, 2014 at 9:00 a.m., in Courtroom 4, 7th Floor of the Robert E. Coyle United States Courthouse of the United States District Court for the Eastern District of California at 2500 Tulare Street, Fresno, California 93721, Plaintiff Dennis Burton ("Plaintiff" or "Burton") will and hereby does move the Court to certify this action as a class action. This motion is made in accordance with Federal Rule of Civil Procedure 23, Local Rule 205 and asks that this Court to certify a class defined as follows:

> All homeowners nationwide who received permanent modification agreements (PMAs) signed by Nationstar from January 2009 through the date when Nationstar implemented its "book then sign" procedure for PMAs, whose permanent modifications Nationstar did not book by the Effective Date stated in the PMA or by the day Nationstar executed the PMA, whichever is later.

This motion is based on this notice and motion, the accompanying memorandum of points and authorities, and all other documents and pleadings in this case.

Dated: July 28, 2014                    Respectfully submitted,

                                        DENNIS BURTON, individually and on behalf
                                        of a Class of similarly situated individuals,

                                        By:   /s/ Steven L. Woodrow
                                                Steven L. Woodrow

Mark Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Steven L. Woodrow*
swoodrow@edelson.com
Megan Lindsey*
mlindsey@edelson.com
EDELSON PC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Tel: 303.357.4878
Fax: 303.446.9111

* Admitted *Pro Hac Vice*

*Attorneys for Plaintiff* DENNIS BURTON

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

I.      INTRODUCTION ........................................................................................ 1

II.    FACTUAL & PROCEDURAL BACKGROUND ..................................... 2

III.   ARGUMENT ................................................................................................ 9

      A.     The Proposed Class Meets the Requirements of Rule 23(a) ............... 10

            1.     The proposed Class is ascertainable and numerous ................... 10

            2.     This litigation will answer for the entire Class, in a single stroke, the common question of whether Nationstar breached its borrowers' PMAs by subjecting them to the sign-then-book process ................................................................................. 12

            3.     Burton's claims share the same legal theory and are typical of the rest of the Class Members ................................................ 14

            4.     Burton and his counsel have and will continue to adequately represent the Class ....................................................................... 15

      B.     The Proposed Class Also Meets the Requirements of Rule 23(b)(3) ................... 17

            1.     The common issues predominate over any individualize issue .............. 17

            2.     A class action is both manageable and superior to any other supposed method for adjudicating the case ................................. 20

      C.     At a Minimum, the Record Here Supports Certification of an Issues Class Consistent with Rule 23(c)(4) .............................................................. 22

IV.   CONCLUSION ............................................................................................ 24

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .......................................... 10, 12, 17

*Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008) .................................... 17 n.11

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ........................................... 10

**UNITED STATES CIRCUIT COURT OF APPEALS**

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .................................................. 14

*Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975) ..................................................... 19

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir. 1977) .......................................... 19

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ................................ 23

*Catlett v. Missouri Highway and Transp. Comm'n,* 828 F.2d 1260 (8th Cir. 1987)
    *cert. denied,* 485 U.S. 1021 (1988) ...................................................................... 20

*Corvello v. Wells Fargo Bank, N.A.*, 728 F.3d 878 (9th Cir. 2013), *as amended on*
    *reh'g in part* (Sept. 23, 2013) ............................................................................ 16

*Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1977) ................ 12

*Glover v. BIC Corp.,* 6 F.3d 1318 (9th Cir.1993) ..................................................... 8 n.8

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)............................... 12, 14, 15, 17

*Hanon v. Dataproducts Corp.,* 976 F.2d 497 (9th Cir. 1992)....................................... 14

*In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) .................................... 12

*Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) .......................................... 17 n.11

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir.),
    *cert. denied,* 133 S. Ct. 338 (2012) ............................................................... 22, 23

*Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003) ............................ 23

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) .................................... 20

*Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32 (1st Cir. 2003)............................... 19

*Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*, 609 F.2d 944 (9th Cir. 1979) ...... 15

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)................................................. 14

*Stewart v. Gen. Motors Corp.*, 542 F.2d 445 (7th Cir. 1976), *cert. denied,* 433 U.S. 919 (1977) .... 20

*United Steel v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010)................................ 17

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) ....................... 16, 19 n.13

*Wolin v. Jaguar Land Rover North Am., LLC,* 617 F.3d 1168 (9th Cir. 2010) ................................20

*Young v. Wells Fargo Bank, N.A.,* 717 F.3d 224 (1st Cir. 2013) ................................................16

*Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180 (9th Cir. 2001), *amended by*
   273 F.3d 1266 (9th Cir. 2001) ..............................................................................9, 19, 21, 23

**UNITED STATES DISTRICT COURT**

*ALLTEL Info. Servs., Inc. v. F.D.I.C.,* 194 F.3d 1036 (9th Cir. 1999) ...............................19 n.13

*Apple Inc. v. Samsung Electronics Co., Ltd.,* 888 F. Supp. 2d 976 (N.D. Cal. 2012) .................8 n.8

*Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439 (N.D. Cal. 1994) ...........................14

*Barefield v. Chevron U.S.A., Inc.,* No. 86-CV-2427, 1987 WL 65054
   (N.D. Cal. Sept. 9, 1987) .................................................................................................14

*Butler v. Sears, Roebuck & Co.,* Nos. 11–8029 & 12–8030, 2013 WL 4478200
   (7th Cir. Aug. 22, 2013) ...................................................................................................18

*Celano v. Marriott Int'l, Inc.,* 242 F.R.D. 544 (N.D. Cal. 2007) ...........................................12

*Flanagan v. Allstate Ins. Co.,* 242 F.R.D. 421 (N.D. Ill. 2007) ............................................13

*Gardner v. Shell Oil Co.,* No. 09-CV-5876-CW, 2011 WL 1522377
   (N.D. Cal. Apr. 21, 2011) ..................................................................................................10

*Gaudin v. Saxon Mortg. Servs., Inc.,* 297 F.R.D. 417 (N.D. Cal. 2013) ...................................18

*Gutierrez v. Wells Fargo & Co.,* No. 07-CV-05923, 2009 WL 1247040
   (N.D. Cal. May 5, 2009) .............................................................................................15-16, 19

*Heartland Commc'ns Inc. v. Sprint Corp.,* 161 F.R.D 111 (D. Kan. 1995) ...........................13

*In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.,*
   MDL No. 10-2193, 2013 WL 4759649 (D. Mass. Sept. 4, 2013) ............................................18

*In re Citibank HELOC Reduction Litig.,* No. 09-CV-0350, Dkt. 96 (N.D. Cal. May 18, 2010) .......17

*In re Coordinated Pretrial Proceedings in Antibiotics Antitrust Actions,* 333 F.Supp. 278
   (S.D.N.Y.), *mandamus denied,* 449 F.2d 119 (2d Cir. 1971) ...............................................20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* No. M 02-1486,
   2006 WL 1530166 (N.D. Cal. June 5, 2006) ......................................................................15

*In re JP Morgan Chase Mortg. Modification Litig.,* Dkt. 402 (D. Mass. Feb. 13, 2014)..........20 n.14

*In re Static Random Access memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603
   (N.D. Cal. 2009).................................................................................................................12

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 268 F.R.D. 604 (N.D. Cal. 2010) ................10

*JPMorgan Chase Bank, N.A. Home Equity Line of Credit Litig.,* No. 10-cv-3647, Dkt 125
   (N.D. Ill. Dec. 10, 2012) ...................................................................................................17

*Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683 (N.D. Ga. 1983) ........................... 13

*Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320 (N.D. Ill. 1991) ........................... 20

*Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610 (C.D. Cal. 2008) ............................... 10

*Menagerie Prods. v. Citysearch*, No. 08-CV-4263, 2009 WL 3770668
  (C.D. Cal. Nov. 9, 2009) ........................................................................................ 13

*Mortimore v. Fed. Deposit Ins. Corp.*, 197 F.R.D. 432 (W.D. Wash. 2000) .......... 14, 17, 21

*O'Connor v. Boeing N. Am. Inc.*, 180 F.R.D. 311 (C.D. Cal. 1998) .............................. 15

*Sanbrook v. Office Depot, Inc.*, No. 07-CV-05938, 2009 WL 840020
  (N.D. Cal. Mar. 30, 2009) ...................................................................................... 14

*Schulken v. Washington Mut. Bank*, No. 09-CV-02708-LHK, 2012 WL 28099
  (N.D. Cal. Jan. 5, 2012) ..................................................................................... 16-17

**STATE COURTS**

*Healey v. Wells Fargo, N.A.*, No. 11-cv-3340, 2012 WL 994564 (Pa. Com. Pl.
  Mar. 20, 2012) ....................................................................................................... 16

*Munger v. Moore*, 11 Cal. App. 3d 1 (Cal. Ct. App. 1970) ................................... 19 n.13

*Strutt v. Ontario Sav. & Loan Ass'n*, 28 Cal. App. 3d 866 (Cal. Ct. App. 1972) .... 19 n.13

*West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285 (Cal. Ct. App. 2013), *reh'g
  denied* (Apr. 11, 2013), *review filed* (Apr. 26, 2013), *review denied* (July 10, 2013) ............... 16

**STATUTES, RULES AND REGULATIONS**

Fed. R. Civ. P. 23. ..................................................................................................... *passim*

**OTHER RESOURCES**

4 H. Newberg & A. Conte, *Newberg on Class Actions* § 18.27 (3d ed. 1992) ................. 19

5 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 24.25 (3d ed. 1992) ............... 14

Anthony T. Kronman, *Specific Performance,* 45 U. Chi. L. Rev. 351 (1978) ......... 19 n.13

Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket
  Guide for Judges* (2d ed. 2009) ............................................................................... 23

*Black's Law Dictionary* 200 (8th ed. 2004) ..................................................... 17 n.11

James Wm. Moore et al., Moore's Federal Practice, ¶ 23.21[1] (3d ed. 2001) ................ 10

Making Home Affordable Program Handbook for Servicers of Non-GSE Loans v4.4
  ("MHA Handbook v4.4"), (Mar. 3. 2014), https://www.hmpadmin.com/portal/
  programs/ docs/hamp_servicer/mhahandbook_44.pdf ....................................... 2. 3. 5 n.6

Manual for Complex Litigation (Fourth) (4th ed. 2004) .............................................. 22

1

Manual for Complex Litigation (Fifth) (5th ed. 1982) ..................................................20

National Consumer Complaint Forum, Nationstar Mortgage,
    http://www.complaintboard.com/nationstar-mortgage-l268.html
    (last visited July 28, 2014) ...............................................................................18 n.12

Nationstar Mortgage Victims Facebook Page, https://www.facebook.com/pages/
    Nationstar-Mortgage-Victims/ 220607231354018 (last visited July 28, 2014) ................18 n.12

Restatement (Second) of Contracts § 347 cmt. a (1981) ...................................19 n.13

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009) ...................................................................................12

Supplemental Directive 09-01 (Apr. 6, 2009), https://www.hmpadmin.com/
    portal/programs/docs/hamp_servicer/sd1001.pdf .................................................2, 11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF CLASS CERTIFICATION**

**I.    INTRODUCTION**

This case challenges Defendant Nationstar Mortgage LLC's ("Nationstar" or "Defendant") violations of the Federal Home Affordable Modification Program ("HAMP")—specifically, its habitual failure to timely honor permanent modification agreements ("PMAs"), form HAMP contracts that it entered into with borrowers. The culprit: Nationstar's sign-then-book policy, which dictated that Nationstar would first counter-sign a borrower's PMA and mail a copy to the borrower. Then, at some later date—sometimes a few days, but most often weeks or months later—Nationstar would "book" the modification by officially changing the loan's terms in Nationstar's electronic loan management system or otherwise implementing the terms.

Class certification is textbook in this case because the litigation will answer, for each Class Member, a central question upon which each of their claims will either succeed or fail, specifically: Did Nationstar uniformly breach its borrowers' fully executed PMAs by using its sign-then-book process? As a trial on the merits will ultimately show, the answer is "yes." By using its sign-then-book process, Nationstar breached each of its PMAs, causing borrowers to suffer damages, which for some (like Burton) included the loss of their home to foreclosure, and for others included damage to credit and delayed HAMP incentives (among other damages). For the purposes of the present motion, the critical fact is that the answer to this common question is susceptible to common proof for the entire Class. Indeed, under its sign-then-book process (in use from approximately May 2009 until early January 2010)[1] Nationstar would, as a matter of routine procedure, countersign PMAs received from borrowers but then wait at least a day (but often much longer) to book or implement the modification terms—thus causing the loans to be reflected in Nationstar's system as having been implemented *after* the PMA's Effective Date (the date it legally should have been implemented)[2]. As a result, between 7,000 and 7,500 borrowers should

---

[1]    Following January 2010 Nationstar claims that it changed this process to a "book-then-sign" procedure, ensuring that modifications were implemented or booked the moment they

[2]    As explained below in Section II, *infra*, Nationstar would countersign after the modification effective date set forth in the PMA had already passed, thereby causing the modification to have become effective at the latest on the date Nationstar countersigned the PMA. (*But see* May 29, 2013 Order Granting Motion to Dismiss, Dkt. 14 at 10.)

have received a modification and either didn't receive one or experienced a delay in the receipt of their modification, incurring damages in either case.

As explained below, based upon the facts of record the Court should readily certify a class of HAMP borrowers with signed PMAs processed under the sign-then-book procedure in accordance with Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(c)(4). Without such relief, borrowers who should have received permanent modifications will either never receive such modifications or will never recover the actual damages they've suffered.

## II.    FACTUAL & PROCEDURAL BACKGROUND

As set forth below, the facts and procedural history of this case support certification.

***As a HAMP Servicer, Nationstar Was Required by HAMP Guidelines to Timely Modify its Borrowers' Loans.***

In May 2009, Nationstar entered into a Servicer Participation Agreement with the U.S. Department of Treasury, through its agent Fannie Mae, agreeing to participate in the HAMP—a federal program designed to provide struggling homeowners with an opportunity to modify their home loan mortgages and avoid foreclosure. (*See* Servicer Participation Agreement, attached as Exhibit A); (*see also* Second Amended Complaint ("SAC"), Dkt. 45, ¶ 5.) As a HAMP Servicer, Nationstar entered into written agreements with its borrowers. (*See* Plaintiff's PMA, attached as Exhibit B); (Template HAMP Agreements, attached as Group Exhibit C.) Specifically, HAMP works in two phases: first, the borrower enters into a trial plan that requires the borrower to make three to four reduced monthly payments. *See* Supplemental Directive 09-01, 14-15 (Apr. 6, 2009), https://www.hmpadmin.com/ portal/programs/docs/hamp_servicer/sd1001.pdf. While the borrower is in the trial plan, the servicer is to prepare the PMA, which the servicer then sends to the borrower for his signature. *See* Making Home Affordable Program Handbook for Servicers of Non-GSE Loans v4.4 ("MHA Handbook v4.4"), 130 (Mar. 3. 2014), https://www.hmpadmin.com /portal/programs/docs/ hamp_servicer/mhahandbook_44.pdf. The servicer is then required to counter-sign the modification promptly, but no longer than thirty days after receiving the signed PMA from the borrower. *Id.* Each PMA, which is a form contract, contains a Modification

Effective Date. MHA Handbook v4.4, 130. The Modification Effective Date is used to determine

when the servicer's obligations are triggered and the timing for incentive payments. *Id.* 144.

**Burton Tries to Get a Loan Modification and Receives Signed Documents, but Nationstar Forecloses on his Family.**

Plaintiff Burton entered into a trial period plan ("TPP") on April 30, 2009 with respect to

his home in Bakersfield, California. (*See* Plaintiff's TPP, attached as Exhibit D.) Burton made his

payments for the months of May, June, and July 2009 as called for in his TPP. (*See* Collection

History Profile, NATIONSTAR/Burton 0000065-67, attached as Exhibit E.) Following his trial

payments, Burton contacted Nationstar to inquire as to when his modification would be put into

effect. (*See id.* 0000070-71.) Following his repeated calls, on August 20, 2009, Nationstar finally

mailed to Burton a PMA for his signature. (*Id.* 0000072). Even though Nationstar didn't mail the

PMA until this date, the Effective Date set forth in the PMA was August 1, 2009. (*See* Ex. B.)

Burton signed the PMA on August 25, 2009 and returned it to Nationstar. (*Id.*)

Thereafter, Burton continued to call Nationstar asking when his modification would be put

into effect. (*See* Ex. E, 0000073-75.) Eventually, on October 13, 2009, Nationstar sent Burton the

counter-signed PMA (*id.* 0000075) dated October 9, 2009. (*See* Ex. B.) Despite receiving this

paperwork, Burton continued to receive foreclosure notices and to be reported as behind to credit

bureaus. (*See, e.g.,* Ex. E, 0000076); (Default Letter, attached as Exhibit F.) When Burton would

call Nationstar, representatives would tell him the loan was simply waiting to be "booked". (*See*

*id.* 0000077.) Burton continued to wait through October - December 2009 with no word from

Nationstar. (*See, e.g.,* Transcript of Deposition of Dennis Burton, 127-130, 144, attached as

Exhibit G.) In January 2010, Burton received an offer for temporary employment in Colorado. (*Id.*

148-150.) In February/March 2010, and without ever having booked the modification, Nationstar

foreclosed on Burton's wife and children. (*See* Ex. C, 0000083-84.).

**Burton Files Suit Based on Nationstar's Failure to Timely Modify his Loan**

On March 4, 2013, Burton initiated this action alleging that Nationstar intentionally and

serially refused to honor HAMP PMAs. (Dkt. 1.) On April 24, 2013, Nationstar filed a motion to

dismiss the Complaint arguing that it had learned sometime in 2010 that Burton no longer

personally occupied the property. (Dkt. 8.) Burton responded that Nationstar had already breached the PMA by that time because it was both after the Modification Effective Date set forth in his PMA (August 1, 2009) as well as after Nationstar signed—the latest possible date that the PMA could have been considered effective. (Dkt. 9.) In this Court's May 29, 2013 Order dismissing the Complaint without prejudice, the Court explained that the "Section 3 modification provision" within Burton's PMA (which the Order referred to as a "HAMA") "provides that Mr. Burton's Loan Documents will be modified effective August 1, 2009." (Dkt. 14, 10) The Court went on to explain that Nationstar did not execute the PMA, however, until October 9, 2009. In light of this fact, the Order reasoned that "[t]here is no dispute that the Modification Effective Date was no later than October 9, 2009," and concluded that "[u]p to that date, Nationstar was empowered to terminate the HAMA if the residence certification was not met." (*Id.*)[3] The Court granted Burton leave to add allegations clarifying that he occupied his house up to the October 9, 2009 date. (*Id.* 12.) Burton filed his First Amended Complaint on June 17, 2013 clarifying that he had occupied the property through December 2009. (Dkt. 15.) Burton confirmed this was the case during his deposition. (Ex. G, 151-52.)

### *May 2013-June 2014: Plaintiff Pursues Relevant Discovery from Nationstar and Amends the Complaint.*

Since the filing of the First Amended Complaint, Burton has sought discovery from Nationstar and, while not everything Burton has requested has been produced, the information of record to date supports certification.[4] During discovery, on October 10, 2013, defense counsel Erik

---

[3]    Implicit in the Court's conclusion is the finding that where Nationstar signs a PMA after the Modification Effective Date set forth in the PMA itself, the date that Nationstar may claim the modification became legally effective is the date Nationstar signed the PMA.

[4]    As set out in detail in Burton's Request for Reconsideration of the Magistrate Judge's decision to deny Burton's motion to enlarge the case management schedule and to extend class certification briefing and related discovery deadlines, beginning on May 16, 2013, Burton vigorously pursued written and oral discovery from Nationstar. This included multiple sets of interrogatories and document requests, dozens of letters, emails, and telephonic meet and confers, the deposition of Plaintiff Burton, and the Deposition of Clay Kellett. (*See* Dkt. 61 at 14-15.) As set forth in that briefing, Plaintiff has gathered meaningful information about Nationstar's policies and procedures related to its HAMP operations—specifically its booking of loan modifications. However, other information, including sampling and Nationstar's Rule 30(b)(6) deposition would allow Burton to supplement the record with additional evidence demonstrating that the Class's claims—specifically those challenging Nationstar's use of a sign-then-book procedure—are subject to common proof.

1  Kemp reported that Nationstar had conducted a file-by-file review of borrowers implicated by this

2  lawsuit and had concluded that supposedly no borrowers, besides Burton, fell within the Class of

3  borrowers who received a permanent modification that was not ultimately booked. Mr. Kemp

4  explained that this was because each borrower that Nationstar reviewed had eventually received a

5  modification of some type. (*See* Oct. 11, 2013 Letter, 3, attached as Exhibit H.) During a meet and

6  confer, Mr. Kemp admitted that the file-by-file review did *not* examine whether the borrowers

7  experienced any delay between when the modification was signed and booked. (*Id.* at 4, 5.)[5]

8  Nationstar took the position that such an inquiry was unnecessary since the Class definition in the

9  First Amended Complaint, according to Nationstar, didn't encompass borrowers who had

10 experienced a delay in booking but ultimately received a modification of some sort.

11      In light of Nationstar's position, Plaintiff moved for leave to amend the complaint on

12 November 25, 2013 to change the class definition. (*See* Dkt. 35.) Magistrate Judge Thurston

13 thereafter granted Plaintiff's Motion for Leave to Amend (Dkt. 41, 42, 43) and Plaintiff promptly

14 filed his Second Amended Complaint ("SAC") redefining the Class as:

15      All homeowners nationwide who received permanent modification agreements
16      (PMAs) signed by Nationstar from January 2009 through the date when
        Nationstar implemented its "book then sign" procedure for PMAs, whose
17      permanent modifications Nationstar did not book by the Effective Date stated in
        the PMA or by the day Nationstar executed the PMA, whichever is later.

18 (SAC, Dkt. 45, at ¶ 38.) Although such borrowers may have ultimately received a modification,

19 none were timely booked by the dates their PMAs became effective. Further, while these

20 borrowers may not have suffered the indignity of foreclosure like Burton, at the very least they

21 suffered other damages in the form of delayed incentive payment accrual time and prolonged

22 negative credit reporting.[6] Put simply, following the amendment there was no doubt that borrowers

23 ─────────────

24 [5]   Further, while Nationstar used this file-by-file review to repeatedly represent to the Court
    that no other Class Members exist besides Burton, Mr. Kemp was unable to confirm in March
25  2014—when Nationstar finally revealed that 7,000 to 7,500 borrowers had been processed under
    the sign-then-book procedure—whether any of these 7,000 to 7,500 borrowers had been part of
26  Nationstar's earlier file-by-file review. (Woodrow Decl. ¶ 9.)

27 [6]   Under HAMP, borrowers receive incentives including payments to reduce principal
    balances, based upon the amount of time they have successfully been in the program. *See* MHA
28  Handbook v4.4, 143-44. By delaying implementation of the modification, Nationstar delayed the
    ability of such borrowers to accrue the necessary time to receive the incentive payments. Similarly,

1  whose modifications were processed under the sign-then-book procedure and who experienced a

2  booking delay were included in the lawsuit.

3  *Nationstar Refused to Produce Certain Discovery Responses*

4  On December 5, 2013, Nationstar served its responses to Plaintiff's second set of Requests

5  to Produce and second set of Interrogatories. (*See* Def.'s Resps. to Pl.'s Second Set of Requests to

6  Produce and Second Set of Interrogs., attached as Group Exhibit I.) In its responses, Nationstar

7  objected to Plaintiff's request for sampling. (*Id.* Resp. to Req. No. 21.) Further, in response to

8  Plaintiff's second set of Interrogatories, Nationstar revealed that one of its systems—the Loan

9  Servicing and Account Management System (LSAMS)—contained the date Nationstar received an

10 executed PMA from the borrower, the date a borrower's PMA was signed by Nationstar, and the

11 date a borrower's PMA was put into effect or "booked." (*Id.* Resp. to Interrog. No. 15.) Nationstar

12 claimed, however, that "[w]hile LSAMS currently contains searchable fields for the information

13 described above, Defendant only began documenting such information in May 2011." (*Id.*)

14 The Parties thereafter continued to meet and confer. On February 21, 2014, Nationstar

15 produced additional policies and procedures and an audit. (*See* Declaration of Steven Woodrow

16 ("Woodrow Decl."), ¶ 7.) As Nationstar continued to object to sampling, the Parties engaged in

17 meet and confers and notified the Magistrate Judge of their dispute in accordance with Magistrate

18 Judge Thurston's procedures. (*Id.* ¶ 8.)

19 ***March through early April 2014: The Parties Engage in a Telephonic Discovery Conference***
***with Magistrate Judge Thurston. Nationstar Responds by Producing Certain Loan-Level Data,***
20 ***and the Parties Continue to Meet and Confer.***

21 On March 17, 2014, the Parties participated in an informal telephonic conference with the

22 Magistrate Judge regarding the Parties' dispute as to Plaintiff's request for sampling. During the

23 conference, Mr. Kemp revealed for the first time that Nationstar had identified between 7,000 and

24 7,500 borrowers who had been processed under the pre-January 2010 sign-then-book procedure.

25 (Woodrow Decl. ¶ 8.) The Court also had questions for Plaintiff's counsel regarding the specific

26 loan file documents being sought through the sampling and indicated that it appeared that the

27

28 because credit reporting was not updated until booking, by delaying the implementation of the
   loans Nationstar caused borrower to be negatively reported for extended periods. *See id.* 142.

Parties hadn't sufficiently exhausted their meet and confer obligations. Nevertheless, at the conclusion of the telephonic conference Magistrate Judge Thurston granted Plaintiff leave to file a joint statement seeking sampling consistent with Local Rule 251(c). (*See* Dkt. 54.)

Four days following the teleconference, on March 21, 2014, Nationstar produced loan level data for approximately 1,800 loans with PMAs that were signed by Nationstar beginning in January 2010 (the "Sample"). (Woodrow Decl. ¶ 10.) On March 24, 2014, Plaintiff's counsel reached out to Mr. Kemp to discuss the nature of the 7,000 to 7,500 loan files that Mr. Kemp had indicated during the teleconference with Magistrate Judge Thurston had been processed during the period of time when Nationstar was still using the sign-then-book procedure. (*Id.* ¶ 9.) On March 28, 2014, counsel engaged in a phone call wherein Mr. Kemp explained that despite locating these 7,000 to 7,500 loan files, Nationstar's position remained that sampling them would still be too burdensome. (*Id.*) Mr. Kemp was further unable to address whether these borrowers were included in Nationstar's prior "file by file" review that Nationstar had previously relied upon to argue to the Court that no other Class Members existed aside from Burton.

The day before that call, on March 27, 2014, Plaintiff sent a follow-up discovery letter to Nationstar reiterating the issues discussed in a prior discovery letter (*see* Mar. 27, 2014 Letter, attached as Exhibit K) and addressing additional questions raised by the Sample data. (*See* Mar. 27, 2014 Letter, attached as Exhibit L.) For example, Sample included data that Nationstar had previously said was unavailable for such loans. Again, in its response to Interrogatory No. 15, Nationstar had stated that the LSAMS database contained loan-level information regarding the date Nationstar received an executed PMA from the borrower, the date Nationstar signed the borrower's PMA, and other information, but that Nationstar "only began documenting such information in May 2011." (*See* Ex. I.) The sample produced March 21, 2014, however, contains these exact data points—demonstrating that Nationstar possesses the data it claimed it didn't start recording until May 2011. Furthermore, the sample was from January 2010, after Nationstar had

supposedly switched to its book-then-sign process, but several of the loans with "booked" modifications were quickly foreclosed on anyway. (Woodrow Decl. ¶ 10.)[7]

***On June 25, 2014, Plaintiff Deposed Clay Kellett; the Deposition and Additional Discovery Supports Certification Here.***

In the meantime, on June 25, 2014, Plaintiff deposed Nationstar employee Clay Kellett in Dallas, Texas. Mr. Kellett explained that during the relevant period of time in 2009 he was a loss mitigation manager who oversaw a team of associates whose job it was to help modify borrowers' loans. (*See* Transcript of Clay Kellett Deposition ("Kellett Trans."), 21:14-16, attached as Exhibit M.) In addition to managing a team of loss mitigation representatives, Mr. Kellett would also physically deliver modification agreements to the Central Booking Department when the loans were ready to be booked. (*Id.* 42:16-25.) Mr. Kellett recalled that he had personally maintained a spreadsheet, on Microsoft Excel, noting for each loan that he had delivered the date he delivered it for booking and the date it was actually received back as having been booked. (*Id.* 35:17-25 – 36:1-21.) Mr. Kellett no longer has this spreadsheet because, for some unknown reason, he deleted this critical evidence sometime in 2013. (*Id.* 35:23 – 37:1-20.)[8] Mr. Kellett couldn't remember any specific loans or the timing between when he would deliver a modification for booking and when it was actually booked (*id.* 47:12-25 – 48:1-10), but he remembered that on average it was two to three days. (*Id.* 50:20-22.) Mr. Kellett could not recall specifics regarding the sign-then-book process or any change to a book-then-sign procedure. (*Id.* 60:2-12.) Mr. Kellett did note that whichever policy Nationstar applied (i.e., sign-then-book or book-then-sign) it applied it uniformly

---

[7]     Again, the fact that Nationstar has produced such conflicting and incomplete information is the subject of Plaintiff's pending Request to Reconsider the Magistrate Judge's denial of Burton's motion to enlarge deadlines and allow additional class certification discovery. (Dkt. 61.)

[8]     In the event the Court enlarges the discovery schedule as Plaintiff has requested, Plaintiff will proceed to ask the Court for an adverse inference that the spreadsheet, if properly preserved, would've shown that weeks or months routinely passed between the time Mr. Kellett would drop off the loans for modification and the dates they were actually "booked." *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976, 985 (N.D. Cal. 2012) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)) ("It is firmly established in the Ninth Circuit that '[a] federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence," which includes the power "to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.'"). In the event the Court would allow such a motion regardless of the fact discovery has closed, Plaintiff requests leave to file one.

1   to all borrowers whenever it was in use—no borrower received disparate or separate treatment. (*Id*.

2   84:25 – 86:1.)

3       In addition to these facts, Nationstar produced several of its policies for modifying loans,

4   including Nationstar's HAMP Modification Document Audit Procedures, which "outline the

5   requirements for auditing PRA, HAMP, MOD24 and Apollo final modification documents to be

6   mailed to Borrowers." (*See* HAMP Modification Document Audit Procedures, attached as Exhibit

7   N.) These documents reveal that when generating PMAs to be sent to borrowers, Nationstar would

8   include Modification Effective Dates that were up to sixty (60) days before Nationstar believed the

9   loan would be put into effect. (*Id.* NATIONSTAR/Burton 0001944.) This helps to explain how in

10  Burton's case, where the PMA was to be put into effect in October 2009, his PMA contained an

11  effective date of August 1, 2009—twenty days before Nationstar even mailed the PMA to Burton.

12  It appears therefore that Nationstar routinely populated its PMAs with Effective Dates that expired

13  long before either Nationstar or the borrower executed the documents and that Nationstar never

14  signed or booked a modification prior to the Effective Date set forth in the PMA. To be sure,

15  Nationstar has produced no example from the relevant period of time (when sign-then-book was in

16  use) to show that any borrower's loan was booked prior to the Effective Date set forth in the

17  borrower's PMA.

18      Based upon these facts of record (as would be supplemented upon further discovery if the

19  Court were to grant Plaintiff's pending Request to Reconsider) and as explained further below, the

20  Court should grant class certification.

21  **III.   ARGUMENT**

22      A party seeking certification bears the burden of showing that the class is ascertainable and

23  meets each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b).

24  *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d

25  1266 (9th Cir. 2001). Rule 23(a) enumerates four prerequisites for class certification: (1)

26  numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Additionally,

27  Rule 23(b)(3) requires that common questions of law or fact predominate on Burton's claims for

28  damages, and that maintaining the suit as a class action is superior to other methods of

adjudication. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Rule 23(b)(2) allows for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Plaintiffs must affirmatively demonstrate compliance with the Rule. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 610 (N.D. Cal. 2010) (court must perform "rigorous analysis" as to whether Rule 23's requirements have been satisfied).

Mr. Burton seeks certification of a Class defined as:

> All homeowners nationwide who received permanent modification agreements (PMAs) signed by Nationstar from January 2009 through the date when Nationstar implemented its "book then sign" procedure for PMAs, whose permanent modifications Nationstar did not book by the Effective Date stated in the PMA or by the day Nationstar executed the PMA, whichever is later.

(SAC ¶ 38.) As explained below, the proposed Class meets the requirements of Rule 23 here, specifically Rule 23(a) and (b)(3), allowing for a class seeking damages, and under Rule 23(c)(4), which allows the Court to certify classes with respect to specific issues—in this case, whether Nationstar's sign-then-book process breached its PMAs with borrowers.

### A.   The Proposed Class Meets the Requirements of Rule 23(a).

As explained below, the facts and discovery uncovered to date show that the proposed class satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation under Rule 23(a).

### 1.   The proposed Class is ascertainable and numerous.

Although not expressly found in Rule 23(a), courts have long held that a class definition, to be sufficient, must be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Gardner v. Shell Oil Co.*, No. 09-CV-5876-CW, 2011 WL 1522377, at *3 (N.D. Cal. Apr. 21, 2011); *see also* 5 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 23.21[1] (3d ed. 2001) ("The identity of class members must be ascertainable by reference to objective criteria."). Objective criteria may include a defendant's business records. *See, e.g., Gardner*, 2011 WL 1522377, at *4; *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 617-18 (C.D. Cal. 2008).

In this case, whether someone is a member of the Class is ascertainable through reference to objective criteria. Whether Nationstar booked a loan before or after signing the PMA is plainly objective. Likewise, Nationstar admits that it was using the sign-then-book policy from at least the start of HAMP in May 2009 through to January 2010. (*See* Def.'s Resps. to Pl.'s First Set of Interrogs., Resp. to Interrog. Nos. 2-3, attached as Exhibit O.)[9] Certainly there is nothing subjective about whether a borrower went through Nationstar's HAMP process when this policy was in effect. Further, as Nationstar's records indicate when a borrower was reviewed and approved for HAMP (as explained below, Nationstar has already identified 7,000 to 7,500 borrowers who, like Burton, were processed during the pre-January 2010 sign-then-book phase of Nationstar's HAMP procedures) it is administratively feasible to identify Class Members. Further, as of May 2009, Nationstar was required to begin reporting to the Treasury data for all loan modifications that it entered into with borrowers. (*See* Supplemental Directive 09-01, 20) and therefore Nationstar undoubtedly has access to records that identify loan modifications that it entered into between May 2009 (when Nationstar signed the SPA agreeing to participate in HAMP) and January 2010 (when Nationstar claims to have converted to a book-then-sign procedure). As such, the Class is ascertainable.

---

[9]    Nationstar's policies leave an open question regarding whether Nationstar actually switched to a book-then-sign process later than it has sworn to, suggesting that the Class has well over 7,500 members. For example, in a Home Modification Booking Procedure produced from July 2010, Nationstar's representatives are required, prior to booking a loan, to ensure that "the executed modification documents" are in Nationstar's Remedy system—the computer program Nationstar used to calculate loan modification terms. (ESC – HAMP Modification Booking Procedures, attached as Exhibit Q); (*see also* Ex. M 115:6-23.) ("Remedy also calculates modifications."). It is unclear whether the executed documents included Nationstar's signature. Likewise, in a Modification Agreement Document Policy dated August 6, 2012, Nationstar indicates that "[u]pon confirming proper execution [by the borrower], the modification agreement shall be countersigned and dated by an Employee with signing authority on behalf of Nationstar." (DOCAD-Modification Agreement Document Policy, attached as Exhibit R.) That policy does not state that the loan needed to be booked prior to Nationstar signing. Rather, the policy indicates that after Nationstar signs, "document Administration shall image the executed modification agreement [and] . . . ship the fully executed loan modification to the Custodian for addition to the collateral file." PMAs were apparently then "stored in a fireproof cabinet until the modification is booked on the system of record." (*Id.*) Regardless of whenever Nationstar actually made the switch to the book-then-sign process, the precise date of which further discovery will help pin-point, the same policy applied uniformly to each borrower until the switch was made (Ex. M 84:25 – 86:1) and Class membership is objective, not subjective.

Relatedly, the Class also satisfies the numerosity requirement, which is met when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no specific number required, nor is the plaintiff required to state the exact number of class members. *Celano v. Marriott Int'l, Inc*., 242 F.R.D. 544, 548 (N.D. Cal. 2007). Generally, numerosity is satisfied when the class comprises forty or more members. *See id.* at 549; *see also Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332-34 (9th Cir. 1977) (184 class members satisfies numerosity). Again, in this case the Class consists of at least 7,000 to 7,500 borrowers. Nationstar admits that it used the sign-then-book procedure at issue in this litigation at least prior to January 1, 2010, (Ex. O, Resp. to Interrog Nos. 2, 3), and Nationstar revealed during the March 17, 2014 teleconference with Magistrate Judge Thurston that the total population of borrowers from the period prior to January 2010 consists of between 7,000 to 7,500 loans. (*See* Woodrow Decl. ¶ 9); (*see also* Ex. L); (April 2, 2014 Letter, attached as Exhibit P.) As such, the Class consists of thousands of borrowers, and the Court should find numerosity is satisfied.

> **2.      This litigation will answer for the entire Class, in a single stroke, the common question of whether Nationstar breached its borrowers' PMAs by subjecting them to the sign-then-book process.**

The next requirement is commonality. As the Supreme Court explained in *Dukes*, "[w]hat matters to class certification. . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. *Dukes*, 131 S. Ct. at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-132 (2009)). Rule 23(a)(2) commonality may be met by a single issue of law or fact. *In re First Alliance Mortg. Co*., 471 F.3d 977, 990-91 (9th Cir. 2006). The issues need not be identical. *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *In re Static Random Access memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) (quoting *Hanlon*, 150 F. 3d at 1022)); *see also Amchem*, 521 U.S. at 623 (same).

Applied here, the instant litigation will generate a common answer for each Class Member with respect to the <u>central</u> issue in each of their cases: did Nationstar breach by failing to book their permanent modifications prior to signing and returning their PMAs (i.e., by using the sign-then-book process for their modification)? As will be ultimately proven at a trial on the merits, the answer for the entire Class—upon which all of their claims succeed or fail—is a resounding yes. In all of their cases, Nationstar signed and returned the PMA first, failing to book or implement the modification by the Modification Effective Date. What matters at this stage of the process is that the answer is susceptible to common proof—which it is. No individual merits determinations will be needed because every Class Member was subjected to the same unlawful policy: sign-then-book. In each case Nationstar breached by signing first instead of booking the modification first.[10]

It is important to recall here that interpreting the PMAs, as form contracts, "present[s] the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." *Menagerie Prods. v. Citysearch*, No. 08-CV-4263, 2009 WL 3770668, at *10 (C.D. Cal. Nov. 9, 2009) (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D. Ga. 1983)); *see also Heartland Commc'ns Inc. v. Sprint Corp.*, 161 F.R.D 111 (D. Kan. 1995) (certifying class seeking recovery of underpaid commissions and bonuses based upon the defendant's uniform erroneous interpretation of the contract and use of computer program that under-reported the actual revenue generated); *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 428 (N.D. Ill. 2007) ("Claims arising out of form contracts are particularly appropriate for class action treatment . . . ."). Applied here, the terms of the PMAs and the process each borrower was subjected to in light of Nationstar's interpretation of those terms—the sign-then-book process— were substantively identical. The terms were forms set by HAMP—no individual Class Member's PMA contained special terms that would allow Nationstar to delay booking his or her loan without

---

[10] Again, this Court's Order granting Nationstar's Motion to Dismiss with leave to amend found that borrowers with signed PMAs, to the extent their modifications were not implemented by their Effective Dates, could state claims for breach of contract. (Dkt. 14 at 10.) As Nationstar did not implement these modifications for at least two to three days following the dates they were signed and delivered by Mr. Kellett to the central modification department for booking (Ex. M 40:3-14), and because Nationstar did not sign modifications prior to their trial plan Effective Dates, each of Class Members has a uniform claim and suffered the same injury—a breach of their PMA contract.

having it considered a breach. As the instant proceedings will generate a common answer for every

Class Member—yes, Nationstar breached their form PMAs when it signed but then waited to book

their modifications—commonality is satisfied.

### 3. Burton's claims share the same legal theory and are typical of the rest of the Class Members.

In addition to sharing common legal and factual issues, the Class meets Rule 23(a)'s

requirement that "the claims or defenses of the representative parties are typical of the claims or

defenses of the class." Fed. R. Civ. P. 23(a)(3); *Hanlon*, 150 F.3d at 1020); *see also Staton v.

Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Typicality "does not mean that the claims of the

class representative[s] must be identical or substantially identical to those of the absent class

members." 5 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 24.25 (3d ed.

1992); *see also Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001). Rather, the named

plaintiff's claims must be "reasonably coextensive" with absent class members' claims. *Hanlon*,

150 F.3d at 1020; *Sanbrook v. Office Depot, Inc.*, No. 07-CV-05938, 2009 WL 840020, at *4

(N.D. Cal. Mar. 30, 2009). The test is whether other class members have the same or similar injury

and whether the action is based on conduct that is not unique to the named plaintiffs. *Hanon v.

Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "A finding of commonality will ordinarily

support a finding of typicality." *Barefield v. Chevron U.S.A., Inc.*, No. 86-CV-2427, 1987 WL

65054, at *5 (N.D. Cal. Sept. 9, 1987).

Applied here, Burton is a member of the Class. *See Arnold v. United Artists Theatre

Circuit, Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994) ("[A] class representative must be part of the

class and 'possess the same interest and suffer the same injury' as the class members.");

*Mortimore v. Fed. Deposit Ins. Corp.*, 197 F.R.D. 432, 437 (W.D. Wash. 2000) (finding typicality

for class on claims of breach of contract, stating that "[o]n a very basic and elementary level,

[plaintiff] seeks to have the defendants charge him what he believes to be the correct interest rate,

and to make sure that they do in the future for both himself and others like him. . . should he be

successful, and that is the crux of [the typicality] requirement."). Like every other Class Member,

Burton was processed under Nationstar's sign-then-book procedure prior to January 2010 and, as

is the case with every other Class Member, Nationstar failed to book his modification by the Effective Date (which again was the date of signing, if not earlier). Burton suffered the same legal injury as everyone else—a breach of his PMA and the denial or delay of the benefits it contained for which he bargained. That he suffered this harm wasn't due to any conduct unique to him; rather, Nationstar inflicted this injury on each of its borrowers who it reviewed for HAMP under the same flawed process.

As such, typicality is met here as well.

>           **4.     Burton and his counsel have and will continue to adequately represent the Class.**

The final hurdle of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Both requirements are met in this case.

Burton can adequately represent the Class Members. "[T]he adequacy requirement mandates that no conflicts of interest exist between the named plaintiffs and the absent class members." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006); *see also O'Connor v. Boeing N. Am. Inc.*, 180 F.R.D. 311, 375 (C.D. Cal. 1998) (stating that "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status"). Adequacy is only defeated by actual conflicts. *Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979). Here the record fails to reveal any actual conflicts between Burton and the rest of the Class Members. Like every other Class Member, Burton did not receive a modified loan when he should have received it. While this may result in Class Members having different amounts of damages than Burton had, as explained below, Section (III)(B)(1), *infra*, this does not defeat certification— classes may be certified where not every class member suffered the same amount of actual damages. *See Gutierrez v. Wells Fargo & Co.*, No. 07-CV-05923, 2009 WL 1247040, at *6 (N.D.

Cal. May 5, 2009) ("[D]amages are almost always individualized issues and, at worst, they can be handled via individualized trials after a claims process."). As Burton doesn't have any interest antagonistic to the Class Members, no actual conflicts exist.

Second, both Burton and his counsel are committed to the vigorous prosecution of this case. Burton sat for his (full day) deposition, has taken his duties as a putative class representative seriously, and has answered all discovery propounded on him completely and on time. (Woodrow Decl. ¶ 15.) Likewise, proposed Class Counsel have no conflicts and are committed to the pursuit of this case as a class action. (*Id.* ¶ 14.) Proposed Class Counsel have invested significant attorneys time and resources investigating Nationstar's practices, gathering discovery, taking the deposition of Clay Kellett, pursuing the information Nationstar has willfully withheld related to the 7,000 to 7,500 putative class members, and seeking appropriate relief and orders from the Court. (*Id.*)

Additionally, proposed Class Counsel have significant experience litigating large national class actions against banks and other financial institutions, specifically on claims challenging conduct under HAMP. (*See* Firm Resume, attached as Exhibit 1 to the Woodrow Decl.) Proposed Class Counsel argued and won reinstatement of a putative HAMP class action in the case of *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 568 (7th Cir. 2012), the first federal appellate decision to hold that aggrieved HAMP borrowers could pursue claims against HAMP servicers under State breach of contract laws. (Woodrow Decl. ¶ 5.) *Wigod* has since been relied upon numerous courts, including the Ninth Circuit, when upholding the rights of borrowers challenging the abuses of their HAMP servicers. *See, e.g., Corvello v. Wells Fargo Bank, N.A.*, 728 F.3d 878 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013); *see also West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 290 (Cal. Ct. App. 2013), *reh'g denied* (Apr. 11, 2013), *review filed* (Apr. 26, 2013), *review denied* (July 10, 2013); *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224 (1st Cir. 2013); *Healey v. Wells Fargo, N.A.*, No. 11-cv-3340, 2012 WL 994564 (Pa. Com. Pl. Mar. 20, 2012). As such, proposed Class Counsel are among the leading attorneys in the Country with respect to HAMP class action litigation.

Further, Edelson PC attorneys have been appointed to leadership in other national class actions and settlements. *See, e.g., Schulken v. Washington Mut. Bank*, No. 09-CV-02708-LHK,

2012 WL 28099, at *12 (N.D. Cal. Jan. 5, 2012) ("Moreover, the Court has reviewed the declaration of Steven Woodrow and the accompanying firm resume and finds that the firm has demonstrated experience in handling complex consumer class actions in the applicable area of law."); *JPMorgan Chase Bank, N.A. Home Equity Line of Credit Litig.*, No. 10-cv-3647, Dkt 125 (N.D. Ill. Dec. 10, 2012) (Edelson attorneys appointed interim co-lead counsel and settlement class counsel in MDL litigation); *In re Citibank HELOC Reduction Litig.*, No. 09-CV-0350, Dkt. 96 (N.D. Cal. May 18, 2010) (same in consolidated Citibank HELOC litigation). In light of this experience and devotion to the case, the Court should find Rule 23(a)'s adequacy requirement is met here.

## B.   The Proposed Class Also Meets the Requirements of Rule 23(b)(3).

As common issues predominate over any claimed individual issues, a class action here is both superior and manageable.

### 1.   The common issues predominate over any individualize issue.

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," which is a "more demanding" standard than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 623-24. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022[11]; *see United Steel v. ConocoPhillips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010); *Mortimore*, 197 F.R.D. at 438 ("It is clear to this Court that the questions of law or fact common to the members of the class predominate over any questions affecting individual members. Since this case involved the use of form contracts, it is particularly appropriate to use the class action procedure."). Predominance is not "determined simply by

---

[11]      It should be noted that no differences in state laws are present in this case that could defeat predominance. The law regarding whether Nationstar breached its contracts is the same in all fifty states. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1263 (11th Cir. 2004) ("A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey.") (citing *Black's Law Dictionary* 200 (8th ed. 2004) (defining "breach of contract" as "[v]iolation of a contractual obligation by failing to perform one's own promise")) *abrogated in part on other grounds* by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). As such, Nationstar cannot rely on claimed differences in state laws to block a finding of predominance.

1  counting noses: that is, by determining whether there are more common issues or more individual

2  issues." *Butler v. Sears, Roebuck & Co.,* Nos. 11–8029 & 12–8030, 2013 WL 4478200, at *4 (7th

3  Cir. Aug. 22, 2013).

4        Though courts have reached differing outcomes when deciding whether to certify a class of

5  HAMP borrowers—a class was certified in HAMP litigation against Saxon Mortgage, *see Gaudin*

6  *v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 419 (N.D. Cal. 2013), while certification was denied

7  in the HAMP MDL formed against Bank of America, *see In re Bank of Am. Home Affordable*

8  *Modification Program (HAMP) Contract Litig.*, MDL No. 10-2193, 2013 WL 4759649, at *14 (D.

9  Mass. Sept. 4, 2013) (holding "[p]laintiffs' claims may well be meritorious; but they rest on so

10 many individual factual questions that they cannot sensibly be adjudicated on a classwide

11 basis")—the instant case presents the strongest set of facts supporting class certification. This is

12 because those other cases sought certification of all of the servicers' HAMP borrowers—meaning

13 those actions lumped together borrowers who had never received a TPP or PMA with borrowers

14 who had made it that far in the process and had received those documents, and mixed borrowers

15 who were approved for HAMP based solely on verbal financial information with borrowers whose

16 eligibility for the program had been verified before their trial plans ever started. *See, e.g., id.* at

17 *11 ("[B]orrowers were required to provide documents permitting verification of all of their

18 income. This is the individual question that arises most frequently, given the Kafkaesque

19 bureaucracy that decided which documents were required of which borrowers."). Such

20 individualized inquiries are avoided here because the Class only includes those borrowers who had

21 received a signed PMA, signifying that their eligibility had already been confirmed and their

22 modifications were already legally binding.[12] Put succinctly, in this case the Class as defined does

23

___

24 [12]    This is not because such other complaints don't exist. A multitude of publicly available sources—from a Facebook group of organized Nationstar victims, *see* Nationstar Mortgage
25 Victims Facebook Page, https://www.facebook.com/pages/Nationstar-Mortgage-Victims/ 220607231354018 (last visited July 28, 2014), to public forums documenting a litany of HAMP
26 complaints, *see, e.g.,* National Consumer Complaint Forum, Nationstar Mortgage, http://www.complaintboard.com/nationstar-mortgage-l268.html (last visited July 28, 2014)—show
27 that such complaints abound. Notwithstanding these likely legitimate complaints and the trauma suffered by such persons, Burton has, consistent with Rule 23, limited his proposed Class to
28 borrowers with whom he shares the same legal injury.

not require any member to "litigate numerous and substantial separate issues to establish his or her right to recover." *Zinser*, 253 F.3d at 1192.

Nationstar may argue that determining each Class Member's damages[13] would present individualized issues, but that is no defense. The law is well settled that differing levels of damages do not defeat predominance. *See Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."); 4 H. Newberg & A. Conte, *Newberg on Class Actions* § 18.27, 18–89 (3d ed. 1992); *see also Gutierrez*, 2009 WL 1247040, at *6 ("[D]amages are almost always individualized issues and, at worst, they can be handled via individualized trials after a claims process."); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir. 1977).

There are several potential solutions available here for addressing the damages calculations. First, the Court could sever the liability phase from a damages phase. Second, the

---

[13] Generally, the standard measure of contract damages aims to award expectation interests under the agreement, plus incidental losses. *ALLTEL Info. Servs., Inc. v. F.D.I.C.*, 194 F.3d 1036, 1040 n.3 (9th Cir. 1999); *see also* Restatement (Second) of Contracts § 347 cmt. a (1981) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed); *see also* § 347 cmt. c ("the injured party is entitled to recover for all loss actually suffered.") The damages suffered in this case are indeed likely to differ depending on certain factors, such as the length of delay between the Effective Date and when the loan was actually booked, whether the borrower incurred unlawful fees, whether the borrower was reported as being delinquent to credit bureaus, and whether the borrower lost his or her home. Nationstar will likely argue that with respect to Burton, who lost his house, his damages are limited to any equity he had at the time of the foreclosure, plus any improperly assessed fees, damages for harm to credit, and any lost incentive payments he would've been eligible to receive had Nationstar booked his loan instead of breaching (which were either delayed or denied due to the breach). *See Munger v. Moore*, 11 Cal. App. 3d 1, 9-11 (Cal. Ct. App. 1970) (damage for wrongful foreclosure limited to equity at time of foreclosure); *Strutt v. Ontario Sav. & Loan Ass'n*, 28 Cal. App. 3d 866, 875-76 (Cal. Ct. App. 1972)). On the other hand, borrowers who are still in their homes could receive either actual damages to compensate for any fees or lost or delayed incentive payments or specific performance, requiring Nationstar to actually provide them with the modifications they were promised. *See Wigod*, 673 F.3d at 568 (citing Anthony T. Kronman, *Specific Performance,* 45 U. Chi. L. Rev. 351, 362 (1978) (theorizing that specific performance is awarded where a court "cannot obtain, at reasonable cost, enough information about substitutes to permit it to calculate an award of money damages without imposing an unacceptably high risk of undercompensation on the injured promisee")).

---

Court could order Class Counsel to craft a class notice that requests additional information from class members about the categories of damages they suffered. As a third option, the Court could grant Burton the sampling he has sought, as requested in his Request to Reconsider. (*See* Dkt. 61.)[14] To be sure, sampling is regularly used to calculate class damages. *See Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1323 (N.D. Ill. 1991); *Stewart v. Gen. Motors Corp.,* 542 F.2d 445 (7th Cir. 1976), *cert. denied,* 433 U.S. 919 (1977); *Catlett v. Missouri Highway and Transp. Comm'n,* 828 F.2d 1260, 1267 (8th Cir. 1987) (backpay determined on classwide basis) *cert. denied,* 485 U.S. 1021 (1988); *see also* Manual for Complex Litigation (Fifth), 2.71 (5th ed. 1982); *In re Coordinated Pretrial Proceedings in Antibiotics Antitrust Actions,* 333 F.Supp. 278 (S.D.N.Y.), *mandamus denied,* 449 F.2d 119 (2d Cir. 1971).

Given the workable solutions available for handling such issues, the Court should find that the common issue—whether Nationstar breached its PMAs by subjecting them to the sign-then-book process—predominates over any individual issues Nationstar seeks to raise.

> **2.     A class action is both manageable and superior to any other supposed method for adjudicating the case.**

Finally, the proposed Class meets the requirements of superiority and manageability. The superiority requirement's purpose is to assure that a class action is the "most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175-76 (9th Cir. 2010). "Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor class certification." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006). Courts consider the factors of Rule 23(b)(3), which include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating

---

[14]     Granting Plaintiff the sampling and enlargement of the case management order he has requested would allow Burton's expert to adequately model such damages. Notably, experts have previously estimated the value of a modification and other damages for the purposes of valuing HAMP class action settlements. *See, e.g.,* Declaration of Professor Michael S. Barr in Support of Settlement, *In re JP Morgan Chase Mortg. Modification Litig.*, Dkt. 402 (D. Mass. Feb. 13, 2014). Similar calculations could be included in this case to forecast damages for the 7,000 to 7,500 settlement Class Members and any other class member should additional facts be revealed showing that Nationstar made the switch to a book-then-sign procedure later than represented.

1    the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a

2    class action. *See* Fed. R. Civ. P 23(b)(3); see also *Zinser*, 253 F.3d at 1190 ("A consideration of

3    these factors requires the court to focus on the efficiency and economy elements of the class action

4    so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on

5    a representative basis.").

6         The first factor considers the interest of each member in "individually controlling the

7    prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Where the damages

8    suffered by each putative class member are not large, this factor weighs in favor of certifying a

9    class action. *Zinser*, 253 F.3d at 1190; *see also Mortimore*, 197 F.R.D. at 438 ("Due to the

10   relatively small size of the each individual class member's claims, it is likely that their claims will

11   never be brought to court without [a] class action . . . ."). Applied here, as explained above the

12   individual damages suffered by each Settlement Class Member are likely to be small—capped at

13   lost equity, improper fees, and delayed or lost HAMP incentive payments (*see supra*, n. 14)—such

14   that individual actions are unlikely to be brought. Certainly attorneys have a difficult time

15   financing such litigation on a contingency basis or pursuant to a comparable arrangement that

16   allows for affordable representation. Therefore, this factor favors finding a class action is the

17   superior method of adjudicating this controversy.

18        The second factor, which asks whether there is additional litigation pending related to the

19   controversy, also supports superiority. *See* Fed. R. Civ. P. 23(b)(3)(B). Here, no litigation

20   concerning the controversy has already begun by or against class members—this is the only class

21   action Class Counsel is aware of challenging this particular sign-then-book policy. (Woodrow

22   Decl. ¶ 13.) Further, neither the National Mortgage Settlement nor the Independent Foreclosure

23   Review would've provided adequate relief to any of the instant putative Class Members. Unlike

24   other banks and third-party servicers, Nationstar did not participate in either settlement, meaning

25   neither agreement provided relief to aggrieved Nationstar borrowers.[15]

26

27

28   ───────────────
     [15]     *See* Joint State-Federal National Mortgage Servicing Settlements, http://www.national
     mortgagesettlement.com/ (last visited July 28, 2014).

The third factor, which asks courts to consider the desirability of concentrating claims in this forum, likewise supports superiority. *See* Fed. R. Civ. P. 23(b)(3)(C). Concentrating the litigation before this Court is desirable because the Class's claims hinge on the same exact legal theory—that Nationstar breached by signing the PMAs after their stated Effective Dates but prior to booking them. Allowing individual courts to reach separate decisions on this issue threatens to introduce a level of uncertainty and inconsistency into Nationstar's HAMP obligations and the rights of its borrowers. As it is clearly preferable to have a single standard applied across all of its HAMP borrowers, having a single court decide the claims for everyone makes the most sense.

Finally, certifying the class here will not be unmanageable. *See* Fed. R. Civ. P. 23(b)(3)(D). As explained above, the legal injury suffered by the Class Members is the same—a breach of their form PMAs. Moreover, and as explained above, several solutions exist for managing any damages issues that may arise down the road, including severing the liability phase from the damages phase, conducting mini-trials on damages, or allowing the sampling Plaintiff has been requesting from Nationstar for almost a year. (*See* Section (III)(B)(1), *supra*.) Any other manageability issues raised by Nationstar are, as will be explained in any reply, exaggerated.

As such, the Court should find that the proposed class action would be superior and manageable.

### C.   At a Minimum, the Record Here Supports Certification of an Issues Class Consistent with Rule 23(c)(4).

As a final point, and only to the extent the Court declines to certify the Class in accordance with Rule 23(b)(3), the Court should certify an issues-class under Rule 23(c)(4). Rule 23(c)(4) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir.), *cert. denied*, 133 S. Ct. 338 (2012); *see also* Fed R. Civ. P. 23(c)(4) Advisory Committee Note ("This provision recognizes that an action may be maintained as to particular issues only.").The Rule allows the Court to certify a class for liability issues only to advance disposition of the entire litigation. *See* Manual for Complex Litigation (Fourth), § 21.24, 273 (4th ed. 2004). Specifically, "Rule 23(c)(4)(A) . . . may enable a

court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." *Id.*; *see also* Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges*, 10 (2d ed. 2009) ("[t]he test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication").

Rule 23(c)(4) allows an action to secure "the advantages and economies of adjudication issues that are common to the entire class on a representative basis . . . even though other issues in the case may need to be litigated separately by each class member." "[G]enuinely common issues" are appropriate to resolve "in one fell swoop" under Rule 23(c)(4):

> If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense ... to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.

*McReynolds*, 672 F.3d at 491; *see also Zinser*, 253 F.3d at 1201 (recognizing Court's authority under Rule 23(c)(4). In *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003), for example, the Seventh Circuit affirmed the district court's class certification of two "core issues," even though "not only the amount but the fact of damage might vary from class member to class member." *Id.* at 911, *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (explaining that the need for individual determinations regarding relief does not undercut Rule 23(c)(4)'s utility of certifying liability issues because "separate proceedings of some character" can be used "to determine the entitlements of the individual class members to relief" including "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages.") (quotation omitted)).

At bottom the Court should certify an issue class under Rule 23(c)(4). The common issue for the entire class—which asks whether Nationstar breached their PMAs by processing them using the sign-then-book procedure—should be adjudicated in a single proceeding. Such a

1  determination would significantly advance the litigation and, if successful, allow aggrieved

2  borrowers to file claims for damages as opposed to having to re-litigate this specific issue. It

3  would further provide consistency and uniformity with respect to Nationstar's borrowers

4  concerning their rights and obligations under HAMP. Consequently, this case presents a model set

5  of facts for, at the very least, certification of an issue class in accordance with Rule 23(c)(4).

6  **IV.    CONCLUSION**

7          Plaintiff Dennis Burton respectfully requests that this Court grant his Motion for Class

8  Certification, certify the Class under Federal Rule of Civil Procedure 23(b)(3) or, in the

9  alternative, under Rule 23(c)(4), appoint Plaintiff Burton as Class Representative, appoint Jay

10 Edelson, Steven Woodrow, and Megan Lindsey of Edelson PC as Class Counsel, establish a

11 deadline for Class Counsel to submit the proposed Class notice and trial plan, and enlarge the case

12 management schedule to allow Plaintiff additional time to seek sampling from Defendant related

13 to sampling and to retain an Expert witness to model damages.

14

15 Dated: July 28, 2014                          Respectfully Submitted,

16                                               DENNIS BURTON, individually and on behalf
                                                 of a Class of similarly situated individuals,

17                                               By:  /s/ Steven L. Woodrow
                                                         Steven L. Woodrow

18 Mark Eisen (SBN - 289009)
   meisen@edelson.com
19 EDELSON PC
   555 West Fifth Street, 31st Floor
20 Los Angeles, California 90013
   Tel: 213.533.4100
21 Fax: 213.947.4251

22 Steven L. Woodrow*
   swoodrow@edelson.com
23 Megan Lindsey*
   mlindsey@edelson.com
24 EDELSON PC
   999 West 18th Street, Suite 3000
25 Denver, Colorado 80202
   Tel: 303.357.4878
26 Fax: 303.446.9111

27 * Admitted *Pro Hac Vice*

28 *Attorneys for Plaintiff* DENNIS BURTON

1

**CERTIFICATE OF SERVICE**

2   I, Steven L. Woodrow, an attorney, hereby certify that I served *Plaintiff's Motion for Class*

3 *Certification* by causing true and accurate copies of such papers to be filed and transmitted to all

4 counsel of record via the Court's CM/ECF electronic filing system, on this 28th day of July 2014.

5

6                  /s/ Steven L. Woodrow

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28